UNITED STATES of America

v.

Keith Joseph DUHON.

No. 97–60034–001.

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

June 1, 2000.

Joseph Thomas Mickel, U.S. Atty's Office, Lafayette, LA, for U.S.

Wayne J. Blanchard, Federal Public Defenders Office, Lafayette, LA, for Defendant.

Patricia Williamson, Milton, LA, interested party, pro se.

## FINAL DETERMINATION OF MENTAL INCOMPETENCY TO STAND TRIAL

METHVIN, United States Magistrate Judge.

Following two evidentiary hearings, the undersigned magistrate judge concluded that Keith Joseph Duhon was incompetent to stand trial due to his mental retardation.[1] As required by law, the court committed Duhon to the custody of the Attorney General for hospitalization "to determine whether there is a substantial probability that ... he will attain the capacity to permit the trial to proceed."[2] Eight weeks later, citing Duhon's successful participation in the hospital's "Competency Restoration Group," the hospital certified Duhon as competent to stand trial. A third evidentiary hearing was held. For the reasons set forth below, the undersigned concludes that the hospital's certification of competency fails to meet the minimal standards of reliability under *Daubert,* and must therefore be rejected. The more compelling evidence, including the testimony of court-appointed experts in forensic psychology and criminal law, establishes that Duhon remains incompe-

---

1. Defendant initially raised this issue on September 2, 1997 when he filed a notice of intent to rely upon the defense of insanity and to introduce expert testimony relating to a mental disease or defect. In response, the government filed a motion for a psychiatric examination pursuant to 18 U.S.C. § 4241, *et seq.*

2. Title 18 U.S.C. § 4241 *et seq.* governs competency determinations as to federal criminal defendants. *See also United States v. Shawar,* 865 F.2d 856, 860 (7th Cir.1989) noting that district courts have no discretion under the statute, even when it appears that the defendant suffers from a mental defect, such as mental retardation, which is not reversible.

tent to stand trial due to mental retardation, a learning disorder, and a seizure disorder. The undersigned also concludes that no further treatment or hospitalization of Duhon is appropriate because: 1) Duhon's mental disabilities are permanent; and 2) Duhon does not pose a "substantial risk of bodily injury to another person or serious damage to property of another" within the meaning of 18 U.S.C. § 4246.

## I. *Background*

On July 24, 1997, defendant was arrested after picking up photos from his post office box, some of which depicted two young girls (Duhon's cousins) in sexually explicit poses. Duhon was subsequently charged in the instant indictment with sexual exploitation of children (Count 1) and

**3.** Count 1 charges a violation of 18 U.S.C. § 2251(a), which provides as follows:

(a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (d), if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

Count 2 charges a violation of 18 U.S.C. § 2252(a)(2), which provides as follows:

(a) Any person who-

 * * * * * *

(2) knowingly receives, or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce by any means including by computer or through the mails, if—

receiving visual depictions of minors engaged in sexually explicit conduct (Count 2).[3]

Counsel was appointed to represent Duhon. After an initial investigation, Duhon's attorney filed a notice of intent to rely upon the defense of insanity and a motion to suppress inculpatory statements which Duhon had given to investigators, alleging that Duhon lacked the mental capacity to knowingly and voluntarily waive his Fifth Amendment right to remain silent. On the government's motion, the court ordered a psychiatric examination of Duhon.[4] The court appointed Dr. James Blackburn, a local psychiatrist, as an expert witness pursuant to 18 U.S.C. §§ 4241(b) and 4242(a)[5], and requested

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
(B) such visual depiction is of such conduct;
* * * shall be punished as provided in subsection (b) of this section.

**4.** Title 18 U.S.C. § 4241(a) states:

(a) Motion to determine competency of defendant.—At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

**5.** Title 18 U.S.C. § 4241(b) states:

(b) Psychiatric or psychological examination and report.—Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c).

Title 18 U.S.C. § 4242(a) states:
(a) Motion for pretrial psychiatric or psychological examination.—Upon the filing of

that he conduct a mental examination and issue a report on Duhon's competence and insanity at the time of the offense.[6] Dr. Blackburn met with Duhon and submitted two reports which were admitted into evidence at the first mental competency hearing on January 29, 1998.[7]

Dr. Blackburn's first report addressed Duhon's competence, and concluded that Duhon is mentally retarded from birth and is not competent to stand trial. Dr. Blackburn noted that Duhon was 20 years old, but looked younger. Duhon relied upon his mother for help with daily tasks such as cooking, cleaning, and financial matters. Dr. Blackburn noted that although Duhon's responses to his questions were appropriate, "many of them indicate a significant level of simplicity and/or naivete." He was oriented and cooperative in the interview, but had a "very limited fund of general information."

> * * * He does not know what is currently in the news. He believes the president is Bush, and he does not know the governor's name. He knows that the state capitol is Baton Rouge, but he thinks it might have something to do with Washington. He likes to go to New Orleans because he likes to go to the aquarium where he can see all kinds of fish. He knows that elephants probably come from Africa as do giraffes. He knows that polar bears come from the North Pole, but is unable to explain how one might end up in the New Orleans zoo. He has a very minimal memory of specifics of what he has seen at the aquarium and has limited ability to relate specifics of his visits to the zoo.

> * * * Mr. Duhon can barely read, basically reads only at a first grade level. He has very few, if any, friends and has an extremely limited social life. He says, however, taking pictures of this type is something too disgusting for him to do and that anyone who did it should be punished. * * * He is not exactly sure how, but assumes they would go to jail. His speculation is that the jail term would be approximately one month. * * * He has practically no understanding of the role of the jury, the judge, or even his defense attorney. He does know that he is "in trouble," but has only a vague concept of what this might mean in terms of consequences.

(Rec. Doc. 25, Court Exhibit 1, p. 2).

Dr. Blackburn's report notes that Duhon initially denied taking the pictures in question, then created different versions of what happened and presented them "with a child's level of expectation that he will be believed." *Id.* at p. 3. Dr. Blackburn's overall impression was that Duhon has "a significant intellectual deficit that precludes him from being able to totally understand the nature of the offenses against him and/or to cooperate in his defense." *Id.*

Dr. Blackburn's testimony at the evidentiary hearing was consistent with his report. He testified that Duhon is moderately mentally retarded and has the intellect of a seven- to eight-year-old child. Dr. Blackburn suggested that additional testing be performed on Duhon beyond intelligence testing in order to measure

---

6. Rec.Doc.19

a notice, as provided in Rule 12.2 of the Federal Rules of Criminal Procedure, that the defendant intends to rely on the defense of insanity, the court upon motion of the attorney for the Government, shall order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c).

7. *See* Court Exhibits 1 and 2, Rec. Doc. 25 (filed under seal following the hearing on 1/29/98). Dr. Blackburn's second report addressed whether defendant was insane at the time of the offense. He concluded that, "Mr. Duhon was not out of contact with reality at the time of his offenses. He, therefore, does not meet the true definition of insane. He does, however, appear to have been suffering from such a severe mental deficit that he would not be considered truly responsible for his acts..." Court Exhibit 2, Rec. Doc. 25.

how well he applies his intellectual ability.[8] He recommended that Warren Lowe, Ph.D. be appointed to conduct the testing. There being no objection by the parties, the court ordered that Duhon be tested and evaluated by Dr. Lowe in accordance with 18 U.S.C. §§ 4241(b) and 4242(a). A second mental competency hearing was scheduled for March 19, 1998.

In a report dated March 11, 1998, Dr. Lowe arrived at the same conclusions as Dr. Blackburn. The results of intellectual and achievement testing conducted by Dr. Lowe indicate that Duhon's current intellectual functioning is in the mild range of mental retardation and that academically, he is functioning at the age of a seven-year old.[9] Dr. Lowe concluded that Duhon suffers from significantly diminished mental capacity which precludes him from being able to fully understand the nature of the charges he faces and to cooperate in his defense.

Prior to the second hearing, the government requested that the court postpone the decision as to Duhon's mental competency until a psychological opinion could be obtained regarding Duhon's potential danger to others.[10] Counsel for the parties were ordered to confer with Dr. Lowe to determine whether he needed to interview Duhon again in order to address this issue.

Dr. Lowe interviewed Duhon again on April 8, 1998 and issued a supplemental report on April 28, 1998.[11] Dr. Lowe concluded that "Mr. Duhon poses a risk only if he is left in an unsupervised living arrangement where young children are present and are also unsupervised." Dr. Lowe also expressed his concern that commitment might lead to a deterioration in Duhon's overall functioning and could exacerbate his seizure disorder.

A second mental competency hearing was held on April 29, 1998. Dr. Lowe's report was filed into the record along with several other exhibits. No witnesses were called to testify. Considering the unequivocal evidence presented, the court found that Duhon was mentally incompetent to stand trial. The government then moved for Duhon's commitment to the custody of the Attorney General for hospitalization for up to four months "to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed." pursuant to 18 U.S.C. § 4241(d)(1).[12]

---

**8.** Because Dr. Blackburn did not administer any tests to Duhon or review any documents pertaining to Duhon's medical or academic history, it was determined that an additional examination should be obtained.

**9.** Duhon obtained a Verbal I.Q. score of 70, a Performance I.Q. of 65, and a Full Scale I.Q. of 67, which indicated the classification of Mild Mental Retardation. In past evaluations by the Lafayette Parish School Board, Duhon's scores were in a similar range. *See* Rec. Doc. 55, p. 2.

**10.** Rec. Doc. 30

**11.** Rec. Doc. 35.

**12.** Title 18 U.S.C. § 4241(d) provides:
(d) Determination and disposition.—If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility -
(1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed; and
(2) for an additional reasonable period of time until -
(A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the trial to proceed; or
(B) the pending charges against him are disposed of according to law; whichever is earlier.
If, at the end of the time period specified, it is determined that the defendant's mental

The court questioned this position since the cause of Duhon's incompetency is mental retardation, which "hospitalization" presumably cannot reverse. The government was ordered to submit a brief on the issue.

On July 27, 1998, the court issued an Order of Commitment.[13] Although it appeared both absurd and harmful to separate from his family a mentally retarded person with the understanding of a seven-year old in order to attempt to "restore competency," the court concluded it had no discretion to do otherwise. *See* 18 U.S.C. § 4241(d)(1) and *United States v. Shawar*, 865 F.2d 856, 860 (7th Cir.1989).

Duhon was admitted to the Federal Correctional Institution (FCI) in Butner, North Carolina on August 14, 1998. On October 16, 1998, the Warden of FCI filed a "Certification of Restoration of Competency to Stand Trial." Attached to the certification was a Forensic Evaluation signed by Dr. Bruce Berger, Staff Psychiatrist, and by Angela Walden, Ph.D., Staff Psychologist.[14] The evaluation reviewed Duhon's background, the facts of the offense and Duhon's course in the hospital. It noted that due to extensive intellectual and cognitive testing in the past, consistently showing that Duhon was mildly retarded, no additional tests were administered at the hospital: "Mr. Duhon's 17 years of testing indicate he likely functions at the Mild Mental Retardation range."[15] The evaluation noted that Duhon was "calm, cooperative, and attentive during interviewing. His thought process-es appeared somewhat limited but with no evidence of loosening of association or psychosis."[16] Addressing the issue of competency, the evaluation stated as follows:

> With respect to competency to stand trial, Mr. Duhon has been enrolled in our Competency Restoration Group and during that time has showed the ability to learn, retain, and relate information inspite (sic) of his limited reading ability regarding his current charges, the potential seriousness of these charges, as well as a general understanding of the adversarial nature of criminal law and an understanding of the criminal process, procedural protection of his rights, and the roles of courtroom personnel. He holds no fixed irrational beliefs about his attorney and voices a positive regard for his attorney. Based in part on our above observations, it is our opinion that Mr. Duhon is competent to stand trial.[17]

The evaluation also addressed the issue of Duhon's dangerousness. Because he had no previous history of violent or inappropriate behavior, and based upon the results of test called the "Rapid Risk Assessment for Sexual Offense Recidivism," the hospital concluded that there was only a 10% probability that Duhon would commit a sexual offense within the next ten years. It was noted that this small risk could be "significantly reduced with supervision."[18]

The court thereafter scheduled a third evidentiary hearing as required by

---

condition has not so improved as to permit the trial to proceed, the defendant is subject to the provisions of section 4246.

**13.** Rec. Doc. 39.

**14.** The Forensic Evaluation states:

During this evaluation Mr. Duhon was seen individually by Bruce R. Berger, M.D., Staff Psychiatrist with psychological consultation provided by Angela Walden, Ph.D., Staff Psychologist. Mr. Duhon was also interviewed by Andres Hernandez, Ph.D., Director of the Sex Offender Treatment Program with Dr. Berger present. Other members of the Forensic Team, Correctional and Mental Health staff had the opportunity to observe his behavior throughout the course of this evaluation. Their comments and observations were considered prior to the preparation of this report. FCI Report, Rec. Doc. 44, p. 2.

**15.** *Id.*, p. 7.

**16.** *Id.*, p. 5.

**17.** *Id.*, p. 9.

**18.** FCI Report, Rec. Doc. 44, p. 9.

§ 4241(e).[19] The parties were notified of the court's intent to appoint two expert witnesses to testify at the hearing, and were invited to submit names. The court's concerns were put on record:

> \* \* \* [T]he [FCI] report does not identify or provide a background of the person or persons teaching Duhon about "his current charges, the potential seriousness of these charges, as well as a general understanding of the adversarial nature of criminal law and an understanding of the criminal process, procedural protection of his rights, and the roles of courtroom personnel." There is no description of the information provided to Duhon which has resulted in his "understanding of the criminal process," nor is there a description of what Duhon actually retained. What exactly does Duhon understand?

> The FCI report provides no scientific or other support for the conclusion that repeating factual information to a mentally retarded criminal defendant so that he learns to retain it has any relevance to the issue of competency. In conclusion, I find that the FCI report lacks sufficient explanation and foundation for its conclusions that Duhon is competent.

Order Requiring Submission of Expert Names, Rec.Doc. 45, p. 6.

After receiving submissions from the parties, the court appointed as expert witnesses a forensic psychologist, Dr. Thomas Fain, Ph.D., F.A. Clin.P., and a criminal defense attorney, Frank Dawkins, J.D.[20] It has been observed that a multi-disciplinary approach is often critical in resolving competency issues, particularly where, as here, the focus is on a defendant's ability to assist counsel. In such a case, "one of the most evident issues is whether the assessing professional, usually a psychiatrist or a psychologist, really knows what would normally go into the defense of the case." [21]

In advance of the hearing, Dr. Fain and Mr. Dawkins submitted their expert reports, both concluding that Duhon was mentally incompetent to stand trial.[22] The third evidentiary hearing was held on September 24, 1999.[23] The government called as its sole witness Dr. Bruce R. Berger, staff psychologist at FCI who signed the certification of competency. The two court-appointed experts also testified at the hearing.

## II. *Competency to Stand Trial*

■ Before turning to the testimony and evidence presented in connection with the third evidentiary hearing, it is helpful to review the legal standards which apply to competency determinations. A criminal defendant may not be tried unless he is

**19.** Rec.Doc. 42. Title 18 U.S.C. § 4241(e) provides:

(e) Discharge When the director of the facility in which a defendant is hospitalized pursuant to subsection (d) determines that the defendant has recovered to such an extent as he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. The clerk shall send a copy of the certificate to the defendant's counsel and to the attorney for the Government. The court shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine the competency of the defendant. If, after the hearing, the court finds by a preponderance of the evidence that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, the court shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial. Upon discharge, the defendant is subject to the provisions of chapter 207.

**20.** Rec.Doc. 51.

**21.** Burt, Michael N., Philipsborn, John T., *Assessment of Client Competence, A Suggested Approach*, 22–JUN Champion 18 (June 1998) (©National Association of Criminal Defense Lawyers).

**22.** Rec. Docs. 54, 55.

**23.** Rec. Docs. 54 and 55

competent. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Cooper v. Oklahoma*, 517 U.S. 348, ——, 116 S.Ct. 1373, 1377, 134 L.Ed.2d 498 (1996).[24] The criminal trial of an incompetent person violates the right to substantive due process. *James v. Singletary*, 957 F.2d 1562, 1569–1572 (11th Cir.1992); *Bishop v. U.S.*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956); *Medina v. California*, 505 U.S. 437, 453, 112 S.Ct. 2572, 2581, 120 L.Ed.2d 353 (1992). Justice Kennedy described the fundamental nature of the right as follows:

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Riggins v. Nevada*, 504 U.S. 127, 139–140, 112 S.Ct. 1810, 1817–1818, 118 L.Ed.2d 479 (1992) (opinion concurring in judgment) (*citing Drope v. Missouri*, 420 U.S. 162, 171–172, 95 S.Ct. 896, 903–904, 43 L.Ed.2d 103 (1975)).

■ The test for competence is also well-settled. In *Dusky v. United States*, the Supreme Court established a three-prong test for competency:

> [T]he test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.

*Id.*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). In *Drope*, the court added a fourth prong to the test by requiring that the defendant be able "to assist in preparing his defense." 420 U.S. at 171, 95 S.Ct. 896. Thus, to be competent, a defendant must be able to (1) consult with the lawyer with a reasonable degree of rational understanding; (2) otherwise assist in the defense, (3) have a rational understanding of the criminal proceedings and (4) have a factual understanding of the proceedings.[25]

■ An erroneous determination of competence "threatens a 'fundamental component of our criminal justice system'—the basic fairness of the trial itself." *Cooper v. Oklahoma*, 517 U.S. 348, 364, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996).

> \* \* \* Because [the incompetent criminal defendant] lacks the ability to communicate effectively with counsel, [the defendant] may not be able to exercise other "rights deemed essential to a fair trial." After making the "profound" choice whether to plead guilty, the defendant who proceeds to trial will ordinarily have to decide whether to waive his "privilege against compulsory self-incrimination" by taking the witness stand; if the option is available, he may have to decide whether to waive his "right to trial by jury"; and, in consultation with counsel, he may have to decide whether to waive his "right to confront [his] accusers" by declining to cross-examine witnesses for the prosecution. With the assistance of counsel, the defendant is also called upon to make myriad smaller decisions concerning the course of his defense. The importance of the rights and decisions demonstrates that an erroneous determination of competence threatens a 'fundamental component of our criminal

---

**24.** In *Cooper,* the Court struck down an Oklahoma statute creating a presumption that a criminal defendant was competent to stand trial unless he proved his incompetence by clear and convincing evidence. *Id.,* 517 U.S. at 368–69, 116 S.Ct. 1373. The Court found the statute violated the Due Process Clause.

**25.** *See* Mental Health Standard 7.4(b), ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS (1984) (hereinafter "Mental Health Standards"). The American Bar Association developed this set of standards for evaluating competence issues, based upon the holdings of *Dusky* and *Drope*.

justice system'—the basic fairness of the trial itself.

*Id.* (internal citations omitted).[26]

■ Mental retardation may render an individual incompetent to stand trial.[27] In evaluating competence, the court should take into consideration the key differences between mentally ill and mentally retarded criminal defendants:

> Separate techniques and measures have been developed for defendants with mental retardation. The prime reason for the division is due to significant differences between the two populations. While incompetency due to mental illness may be very different over time and may be reversible with treatment, incompetency due to mental retardation is more static and relates more directly to susceptibility to suggestion.[28]

Courts should specifically guard against the arbitrary use of general competency assessment techniques and standards in assessing a mentally retarded defendant's competency:

> [T]he existence of a specialized competency scale for assessing persons with mental retardation does not mean that there are no other customary and accepted methods of assessment. There is a general recognition that competence is based on a specific set of cognitive abilities and the functional capacity to exercise those abilities. Thus, competency scales or structured interviews can be used with persons who have mental retardation. *However, because persons with mental retardation are cognitively impaired, not mentally ill, the strongly cognitive elements of a competency evaluation need to be given special attention. In addition, defendants with mental retardation may be limited as to their functional behavior. Thus, a defendant with mental retardation might be seemingly "restored" to competency by instructing that individual about trial elements, but he or she may not be able to make intelligent legal decisions.*[29]

## III. *Expert Reports and Testimony*

### A. *The Government*

The forensic evaluation supporting the FCI's certification of competency notes that Duhon is mildly mentally retarded, has a reading disorder, and requires supervision, guidance and assistance on a daily basis. However, for reasons discussed above, it concludes that Duhon is competent to stand trial. Dr. Bruce R. Berger, who signed the evaluation, testified at the evidentiary hearing as an expert in child, adult and forensic psychiatry. Dr. Berger is licensed to practice in the State of North Carolina. He is Board Certified in the areas of child, adolescence and forensic psychiatry and has been previously qualified as an expert in each of

---

**26.** There is no distinction between competence to enter a guilty plea and competence to stand trial. *Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321, (1993). "[I]n sum, all criminal defendants—not merely those who plead guilty—may be required to make important decisions once criminal proceedings have been initiated ..." *Id.* at 2686. These decisions include whether to waive the privilege against self-incrimination, whether to take the witness stand, whether to waive the right to trial by jury, whether to decline to cross-examine certain witnesses, whether to put on a defense, and whether to raise one or more affirmative defenses. *Id.* at 2685.

**27.** Mental Health Standard 7–4.1(c) provides:

A finding of mental incompetence to stand trial may arise from mental illness, physical illness, or disability; mental retardation or other developmental disability; or other etiology so long as it results in a defendant's inability to consult with defense counsel or to understand the proceedings.

**28.** National Benchbook on Psychiatric and Psychological Evidence and Testimony, Chapter 7 at 168 (ABA Commission on Mental and Physical Disability Law, Sept. 1998) (hereinafter "National Benchbook").

**29.** National Benchbook, Chapter 7 at 169 (emphasis supplied).

these areas.[30] His duties as staff psychologist at FCI include the evaluation of defendants referred to the facility by the courts for a determination of their competency to stand trial.

Dr. Berger testified that he interviewed Duhon approximately four to eight times and that the interviews lasted anywhere from fifteen minutes to an hour and a half.[31] Dr. Berger also reviewed documents pertinent to Duhon's case and discussed Duhon's progress in the competency restoration group with the social worker in charge, Ann Perry, ACSW, Director of Rehabilitation Services.[32] Dr. Berger testified that at the time of Duhon's release from FCI, he believed Duhon to be competent to proceed to trial, but that depending upon Duhon's stress level and "reinforcement of learning," he might have lost capacity.[33]

... [T]he one exception would be the issue of has he, in terms of continuing to reinforce whatever education or legal concepts or things of that nature, I don't know whether that has been done or not. I know we spent quite a bit of time doing that ... [34]

Dr. Berger was questioned at length concerning the competency restoration group. The report cited Duhon's behavior in the group as a key factor in concluding he was competent. Dr. Berger explained that Ms. Perry developed and administered the group classes, and that he had not attended the classes himself.[35] He is aware that Ms. Perry is an accredited social worker, but did not know whether she had a bachelor's degree.[36] The classes take place in a 15 by 20 foot room where the group sits in a circle in chairs.[37] Occasionally, a picture or a schematic might be drawn of a typical courtroom.[38] Duhon attended seven or eight group sessions. The focus of each session, and Ms. Perry's observations as to Duhon' behavior in each class, were as follows:

| FOCUS OF CLASS | OBSERVATION NOTES |
| --- | --- |
| Working With Your Attorney | "Indicates his mother talks to his attorney on his behalf. He has retained the information learned thus far. His questionnaire will be filed on Friday." |
| Courtroom Personnel | "Eager to participate!" |
| Legal Words | "Has an excellent memory. He can quickly and accurately provide answers to questions." |
| Defendant's Role | "Doing extremely well. No deficits noted." |
| Working with your Attorney | "Spoke favorably of his attorney." |
| Components of being CTST (competent to stand trial) | "No noted changes." |
| Courtroom Personnel | "No changes." |

(Government Exhibit "Butner 2" introduced at third evidentiary hearing).

Dr. Berger testified that to the best of his knowledge, competency restoration programs are well-accepted in the medical and psychological community. However, he did not provide, and the government did not offer, any articles or peer review or other professional writing supporting the effectiveness of the practice. When questioned regarding whether Ms. Perry based her protocol on any accepted study or clinical approach, Dr. Berger testified that

30. Tr. 5–6

31. Tr. 8–9

32. Tr. 9–10, 18, 54–55. The documents reviewed by Dr. Berger are outlined in correspondence from the United States Attorney's office to the Federal Correction Institution dated September 1, 1998. Exhibit Berger 2.

33. Tr. 12–16. Dr. Berger also testified that a mentally retarded individual could gain, lose, and regain capacity depending upon variants which might result in a "decay of his knowledge." Tr. 32.

34. Tr. 37–38

35. Tr. 54–55.

36. Tr. 42.

37. Tr. 40.

38. Id.

he didn't know.[39] He did remember having general discussions with Ms. Perry and felt sure he gave her some literature. However, he stated, "to my knowledge [she] does not have workbooks or things of this nature. It is nearly all verbal."[40] Dr. Berger explained that the group got started as follows:

> I think the group in part started because—let me go back. In terms of competency, it really is a concept in forensic psychiatry that people usually can be incompetent for any number of reasons. Typically, you think because they are crazy and delusional, you give them medication but the other thing is you need to have education about the court. You see that with some people that are very isolated and some people that come in with a cultural problem from different areas that don't understand what we are doing and because of that it wasn't consistent, across the board.
> * * * that is why we started the group, so that we could not only educate but take and assess ten people, give them the information they can use it or they can not use it, so it's both to educate and to assess. And the group has now been going on, I would say, for probably four years, I guess.[41]

Dr. Berger was familiar with testing protocols to determine whether a mentally retarded person is competent to stand trial, such as the Competence Assessment for Standing Trial for Mental Retardation (CAST–MR), and the Georgia Court Competency Test. Dr. Berger testified that the FCI does not use any such tests, and none were administered to Duhon.[42] He was also familiar with a competency checklist based upon research at the University of Virginia which rates a patient's level of understanding from "excellent" to "none." However, this checklist was not used with Duhon.

The crux of Dr. Berger's testimony was that a person can be educated into competency to stand trial if a major problem is a lack of knowledge of the court system and criminal proceedings.[43] While the competency restoration group also serves as an assessment tool, its key function appears to be as a forum for the presentation of specific factual information, which the patients are then asked to memorize and retain.

Dr. Berger admitted that the opinion of Ms. Perry on whether a defendant's competency has been restored impacts his conclusion regarding competency:

> If Mrs. Perry communicates to me that a person in that group has been restored to competency, I always recheck it. At the same time I believe Mrs. Perry is really good at what she does, so some concerns would impact, at least my—if she thought someone had done very well in her competency class, I would be predisposed to think that but at that point I always and do always continue to go over that with the first time evaluation.[44]

Dr. Berger stated that his findings were based on his individual assessment of Duhon in that he observed Duhon was "able to generate things without direct questions" and "would jump from one issue to the other so he could use some abstract reasoning that seemed fairly good."[45] Dr. Berger based this opinion, at least in part, on Duhon's ability to discuss court proceedings in terms of an analogy to a sports game (i.e., when asked who would be the

39. Tr. 57.

40. Tr. 57–58.

41. Tr. 53.

42. Tr. 45–46

43. Tr. 64.

44. Tr. 55

45. Tr. 62–63

referee in a baseball game, Duhon would provide the answer "the judge.") [46]

Dr. Berger admitted that the FCI report does not address Duhon's ability to assist counsel in discussing strategies for his defense: [47]

> THE COURT: Do you think that that is a factor that should be considered in determining competency, whether the person has any ability to understand strategies based upon his understanding of the charges and relevant outcome, based upon whether they testify or don't testify which of course would involve an understanding of what the testimony they would give and the effect it would have on the Judge and jury, how it could be refuted by the witnesses, et. cetera ... Just focusing on his ability to even engage in that type of conversation, do you think that should be a factor in assessing competency?
>
> THE WITNESS: Yes.
>
> THE COURT: Is that part of Mr. Duhon's assessment? Was it in the report here, because what I understand from the competency restoration group is that the information that was discussed had to do with very basic material ... Their right to testify or not to testify, what the general understanding of the charge is, who the players are, what the courtroom is like, where the witness stand is, things that really are very basic and, as far as I'm concerned, don't really address the heart of the issue of the competency which is whether or not they can assist counsel in defending themselves ... Do you feel that it should be part of the competency assessment, a determination of a person's ability to engage in that kind of conversation, a strategic conversation with counsel so they can assist in their own defense and you said, yes, it was. Is that in the report anywhere?
>
> THE WITNESS: ... I don't think it is.

> THE COURT: Do you have an opinion about that?
>
> THE WITNESS: I thought at the time that he had a basic ability to understand strategy and the fact that his attorney was fully on his side and did give adequate information; yes, he did.

Considering the evidence presented, the undersigned concludes that the FCI failed to consider all four factors required by the Supreme Court in assessing Duhon's competence. As noted above, a competent defendant must be able to: (1) consult with the lawyer with a reasonable degree of rational understanding; (2) otherwise assist in the defense, (3) have a rational understanding of the criminal proceedings and (4) have a factual understanding of the proceedings. The FCI's determination of competency, as explicated by Dr. Berger's testimony, focused mainly upon the fourth factor. By educating Duhon in the competency restoration group, he learned to memorize and retain certain factual information about criminal proceedings. While there is also some evidence that Duhon perhaps has a rational understanding of the proceedings (factor 3), nothing in the FCI report addresses Duhon's ability to "consult with his lawyer with a reasonable degree of rational understanding" or "otherwise assist in the defense." A "basic ability to understand strategy" and knowledge that "his attorney was fully on his side" are not legally sufficient. [48]

### B. The Court Appointed Experts

#### 1. Psychological Expert, Dr. Thomas Fain

■ Dr. Fain testified as the court-appointed expert in clinical and forensic psychology. Dr. Fain is the only board certified forensic psychologist in the state of Louisiana. He is a Diplomat in clinical/forensic psychology and engages in a private practice of clinical and forensic psychology

**46.** Tr. 62–63

**47.** Tr. 72–75

**48.** Tr. 75

with a specialization in forensic examination. Dr. Fain has had first-hand experience with competency restoration groups in his position as Chief of Psychological Services at Feliciana Forensic Facility in Jackson, Louisiana and at Task Air State Hospital in California.[49]

As directed by the court, Dr. Fain examined Duhon and performed tests to assess his competence. Dr. Fain concluded in his written report that Duhon is not mentally competent to stand trial, and testified unequivocally that Duhon was not restored to competency while incarcerated at FCI.:

> It is this evaluator's considered opinion that Keith Joseph Duhon is subject to a permanent state of mental disease or defect which renders him to the state of lacking adequate ability to fully participate in his defense (both impaired understanding of proceedings and impaired ability to assist counsel in his defense). This impairment is likely a product of mental disease/defect associated with heritable/congenital cognitive retardation, epilepsy, and developed personality factors. It is this evaluator's opinion that this mental disease or defect hinders or precludes Mr. Duhon from full capacity to understand and practice daily living skills with the full culpability of a typical or normal man on the street. It is unlikely that this state of defect will be ameliorated via intervention strategies or treatment attempts. *At best, intervention procedures may effect a rote repetition of conditioned verbalizations regarding the above requirements to reach competence, but these conditioned verbalizations will be hollow and without cognitive understanding or appreciation of content.*[50]

Dr. Fain provided extensive testimony regarding the specific tests he performed on Duhon and their results, including the Folstein Mini–Mental State Examination, the Hooper Visual Organizational Test, the Georgia Court Competency Test, Mississippi State Hospital Revision, and the Competency Assessment for Standing Trial for Defendants with Mental Retardation (CAST–MR).[51] The results of the CAST–MR indicate that Duhon is incompetent to stand trial:

> A. Mr. Duhon's total score was 8.6 points below the normative group for the mentally retarded who were found incompetent to stand trial. So he was even below the mean score for the typical retarded client who was found incompetent, and he was 20 points below the mean for the normative group of the mentally retarded who were found competent to stand trial. So he was significantly impaired when it came to a competency assessment.
>
> Q: Is this a close call, in your opinion, his competency to stand trial overall?
>
> A: No.[52]

Dr. Fain testified that he believed both the test and Duhon's result to be valid.[53] Dr. Fain's conclusion that Duhon is incompetent to stand trial was also based on and supported by the other test results,[54] by

**49.** Tr. 115

**50.** Rec.Doc. 55

**51.** The National Benchbook notes that the CAST–MR is the only standardized test for assessing competence in the mentally retarded, as opposed to the mentally ill:

> Despite the differences between the two types of mental disabilities—mental illness and mental retardation -all but one of the major assessment tools are designed to measure competency related to mental illness or mental disorders generally and not mental retardation specifically. The one instrument that specifically measures the competency of persons with mental retardation is the Competency Assessment for Standing Trial for Defendants with Mental Retardation (CAST–MR).

National Benchbook, Chapter 7 at 198.

**52.** Tr. 113–115

**53.** Tr. 110–111

**54.** Dr. Fain testified that these tests are valid and generally accepted for the purposes for which they were used. Tr. 132–140.

Dr. Lowe's and Dr. Blackburn's previous evaluations, and by Duhon's school records.[55]

Dr. Fain testified that he was unaware of any peer reviews or publications dealing with the effectiveness of competency restoration groups. In fact, he testified that there is controversy within the psychological community about the effectiveness of such programs, and that they are generally *not* accepted as effective.[56]

Dr. Fain also testified on the issue of whether or not an incompetent, mentally retarded defendant could be rehabilitated and made competent to stand trial. He explained that a mentally retarded defendant with a high level of adaptive functioning could become competent. However, a defendant such as Duhon, with diminished intellect and poor adaptive functioning would most likely not be able to reach the threshold for competency.[57]

### 2. Criminal Defense Expert, Frank Dawkins

Mr. Dawkins testified as the court-appointed attorney expert. Mr. Dawkins has been licensed to practice law in Louisiana for over twenty years, worked as an Assistant United States Attorney for approximately three years in the criminal division, and has practiced criminal defense in private practice for over ten years.[58] Mr. Dawkins met separately with Duhon and with Dr. Fain, and reviewed a comprehensive list of documents, including a copy of the offense report and Duhon's records. Mr. Dawkins concluded that Duhon could not perform the essential tasks required to be competent to stand trial:

A: After meeting with Mr. Duhon, meeting with Dr. Fain, reviewing all of the documents that you reviewed, ethically as a defense lawyer, how did you feel about whether or not Mr. Duhon could understand the import of the guilty plea and, more importantly, understand all of the information that he could have to digest to go through a guilty plea in Federal Court? Do you think he could do that?

Q: I think a *Boykin* exam would be extremely difficult for him to go through to really understand what he was admitting to. I think it would be an extremely difficult chore for any Court to feel satisfied at the end of the proceeding that he really clearly knew what rights he was waiving in return for a plea ...

Q: If you had to defend Mr. Duhon, do you feel, based on what you know, that he could aid you in his defense of him?

A: I used a phrase in the letter that I wrote. It was a figure of speech, but you know it was really almost meant literally in that he would be more or less sitting next to me as a bump on a log. If I were his lawyer and he went to trial, I don't think he would be able to provide any assistance to me ...[59]

In his written report, Mr. Dawkins concluded, "it is my opinion that Mr. Duhon lacks the mental capacity to consult with his lawyer with a reasonable degree of rational understanding and to otherwise assist in his defense even though he has a limited if rational understanding of the criminal proceedings and his situation as a defendant."[60]

### IV. The Court's Gate–Keeping Function under Daubert

■ The certification of competency was issued to the court pursuant to statu-

---

55. Tr. 121–122

56. Tr. 117–120

57. Tr. 119–120 and 130–131

58. Re. 151–152

59. Tr. 155–156.

60. Rec.Doc. 54

tory procedure. *See* 18 U.S.C. §§ 4241(b) and 4247(c).[61] Although there is little precedent on the issue, the undersigned concludes that there is nothing in the applicable statutes which exempts such certifications from the requirement that they be reliable under Rule 702 F.R.Evid. and the standards enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).[62] Furthermore, because the issue of competency for a criminal defendant is a critical one, with constitutional implications, it is even more important for the court to be vigilant in disallowing unreliable psychological evidence.

Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto.

" 'Knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786.

Thus, the court should exclude proffered expert testimony that is no more than unsupported speculation. *Id.* at 592–93, 113 S.Ct. 2786.

■ *Daubert* enunciated a four-prong test for courts to utilize in their gate-keeping responsibility to ensure the reliability of expert testimony: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) the theory's known or potential rate of error and the existence and maintenance of standards and controls; and (4) the theory's general acceptance in the relevant community. *Daubert*, 509 U.S. at 592–594, 113 S.Ct. 2786. It is now clear that the trial court's gate-keeping responsibility applies to all experts, whether they rely on scientific, technical, or other specialized knowledge such as psychology. *Kumho Tire*, 119 S.Ct. at 1174. The court must ensure that an expert witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 1176. Trial judges have "considerable leeway" in making this determination. *Id.*

■ The FCI's forensic evaluation report cites Duhon's behavior and responses in the competency restoration group as

---

**61.** For the text of 18 U.S.C. § 4241(d), see fn. 5, *supra*.

Title 18 U.S.C. § 4247(b) states:

(b) Psychiatric or psychological examination.—A psychiatric or psychological examination ordered pursuant to this chapter shall be conducted by a licensed or certified psychiatrist or psychologist, or, if the court finds it appropriate, by more than one such examiner. Each examiner shall be designated by the court, except that if the examination is ordered under section 4245 [governing hospitalization of mentally ill prisoners] or 4246 [governing hospitalization of mentally ill persons due for release from imprisonment], upon the request of the defendant an additional examiner may be selected by the defendant. For the purposes of an examination pursuant to an order under section 4241, 4244, or 4245, the court may commit the person to be examined for a reasonable period, but not to

exceed thirty days, and under section 4242, 4243, or 4246, for a reasonable period, but not to exceed forty-five days, to the custody of the Attorney General for placement in a suitable facility. Unless impracticable, the psychiatric or psychological examination shall be conducted in the suitable facility closest to the court. The director of the facility may apply for a reasonable extension, but not to exceed fifteen days under section 4241, 4244, or 4245, and not to exceed thirty days under section 4242, 4243, or 4246, upon a showing of good cause that the additional time is necessary to observe and evaluate the defendant.

**62.** In *U.S. v. Gigante*, the court found that all of the psychological experts, including those at a Federal Correctional Institution, satisfied *Daubert*, and cited evidence of malingering in concluding that defendant was competent to be sentenced. *U.S. v. Gigante*, 996 F.Supp. 194, 200 (E.D.N.Y.1998).

evidence that he is competent. However, the report contained no explanation of what information was presented to Duhon and what he actually understood as opposed to what he memorized in rote responses. Dr. Berger was unable to provide any insight because he had never attended one of the classes. Furthermore, Dr. Fain's testimony establishes that the use of competency restoration groups is controversial and not generally accepted in the psychological community.

Considering the foregoing, the undersigned concludes that the FCI report is unreliable insofar is it bases its conclusions upon Duhon's performance in the competency restoration group. To the same extent, the court rejects Dr. Berger's testimony that Duhon was "educated" into competency at the competency restoration group sessions.

## V. *Statutory Framework*

Having concluded that Duhon remains incompetent to stand trial, the court must determine Duhon's status in general, and whether further hospitalization is required in particular. A review of statutory framework and jurisprudence is therefore in order.

■ A defendant has substantive due process right not to be tried unless competent, and a procedural due process right to an adequate hearing on competence. *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *James v. Singletary*, 957 F.2d 1562, 1569–1572 (11th Cir.1992). The statutory framework for determining competency was first established in 1949.

A 1949 statute first provided a procedure for resolving whether a defendant was competent to stand trial. The statute, which originally was 18 U.S.C.

§ 4244 and since 1984 has been 18 U.S.C.A. § 4241, was the product of seven years of study by what the Supreme Court called a "conspicuously able committee." The statute's constitutionality has been upheld as necessary and proper to the federal power to prosecute offenses.

WRIGHT, FEDERAL PRACTICE AND PROCEDURE, CRIMINAL 3D § 196.[63]

When the competency of a defendant is raised, § 4241(a) requires the court to conduct a hearing to determine whether "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense..." § 4241(a) and (d).[64] The court may obtain a psychological report prior to the hearing under § 4241(b).[65] If the court finds the defendant mentally incompetent to stand trial, the court is required under § 4241(d) to commit the defendant to the custody of the Attorney General for hospitalization "for treatment in a suitable facility" for:

(1) a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed; and

(2) for an additional reasonable period of time until—

(A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the trial to proceed; or

---

**63.** In 1984, the statutory provisions affecting both the determination of insanity at the time of the offense and competency to stand trial were completely rewritten by the Insanity Defense Reform Act of 1984, Sen. R. No. 98–225, at 236 (1983), reprinted in 1984 U.S.C.C.A.N. (98 Stat.) 3182, 3418 ("This test of competency, in essence, adopts the standards set forth by the Supreme Court in *Dusky v. United States*.")

**64.** *See* fn. 4 and fn. 12, supra.

**65.** *See* fn. 5, supra.

(B) the pending charges against him are disposed of according to law; whichever is earlier ...

Commitment of defendant to the custody of the Attorney General under § 4241(d) is mandatory where the district court finds the defendant incompetent to stand trial and is not limited to cases in which there is probability that there will be change in defendant's mental condition. *U.S. v. Shawar*, 865 F.2d 856 (7th Cir. 1989).[66]

 If the hospital issues a certification under § 4241(e) that the defendant has recovered and is competent, as happened in this case, the court is required to hold another hearing to determine the defendant's competency.[67] If the court agrees that the defendant has recovered, the court orders the defendant discharged from the facility and sets the case for trial. However, in a case such as that presented here—where the court rejects the certification of competency— § 4241(e) provides no guidance.

While the issue has not been briefed, it could be argued that since Duhon was hospitalized at the FCI for only two months, and § 4241(d)(1) allows up to four months for the initial hospitalization, the court should therefore re-admit Duhon for further "treatment." Given the preceding discussion, however, it is clear that the nature and scope of Duhon's mental defi-

---

**66.** Because the statute mandates commitment even where defendant has no likelihood of becoming competent, the logical ramification in cases such as the one *sub judice* is that a great deal of time and expense is devoted to a futile and possibly harmful exercise:

> In some situations, an evaluation of restorability to competence may be unnecessary and, therefore, inappropriate. Cases involving severely developmentally disabled defendants or defendants suffering from an organic mental disorder involving a permanent dysfunction of the brain are examples. In such cases, at the time the defendant is found mentally incompetent, the trial judge should be authorized to find the defendant permanently incompetent without the necessity of further detention for evaluation.

27 U.C. Davis L.Rev. 1, 10 (Fall, 1993).

It should be noted, however, that while commitment to the custody of the Attorney General has generally meant commitment to a Federal Correctional Institution, at least one court has questioned the legitimacy of that position:

> The statute requires "treatment in a suitable facility." Section 4247(a)(2) defines "suitable facility" as "a facility that is suitable to provide care or treatment given the nature of the offense and the characteristics of the defendant." Section 4247(i)(C) requires the Attorney General "before placing a person in a facility pursuant to ... section 4241[to] consider the suitability of the facility's rehabilitation programs in meeting the needs of the person." Congress's repeated emphasis on suitable facilities in these provisions indicates that it did not intend for the Attorney General to put mentally incompetent defendants into a hospital automatically upon a judicial finding of incompetency. Instead, Congress wanted the Attorney General to give the accused the treatment which the accused needs to become competent to stand trial. Such an interpretation avoids the constitutional problems that could arise when institutionalization would harm the accused, rather than help.

> *U.S. v. Sherman*, 722 F.Supp. 504, 506 (N.D.Ill.1989).

**67.** Title 18 U.S.C. § 4241(e) provides:

> (e) Discharge.—When the director of the facility in which a defendant is hospitalized pursuant to subsection (d) determines that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. The clerk shall send a copy of the certificate to the defendant's counsel and to the attorney for the Government. The court shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine the competency of the defendant. If, after the hearing, the court finds by a preponderance of the evidence that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, the court shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial. Upon discharge, the defendant is subject to the provisions of chapter 207.

cits permanently prevent him from attaining competence to proceed to trial. Therefore, the court will not require further hospitalization pursuant to § 4241(d).

The only other provision which might apply is § 4246,[68] which becomes applicable when a defendant reaches the end of his period of hospitalization and remains incompetent. Under this provision, a defendant due for release may remain subject to the custody of the Attorney General after certification and a hearing showing: (1) that the defendant is presently suffering from a mental disease or defect; (2) that the defendant's release would create a substantial risk of bodily injury to another person or serious damage to property of another; and (3) that suitable arrangements for state custody and care of the person are not available.

Section 4246 is inapplicable for two reasons: first, Duhon was discharged from the hospital after his evaluation, and therefore is no longer confined as contemplated in this section. Second, the FCI specifically certified that Duhon's release would *not* pose a "substantial risk of bodily injury to another person or serious damage to property of another" within the meaning of the statute, again making § 4246 inapplicable.

Unfortunately, the statutory framework provides no clear guidance for the situation presented. Other courts have noted the statutory gaps. *See U.S. v. Shawar*, 865 F.2d 856, 863 (7th Cir.1989) ("Admittedly, it is not entirely clear what should happen after the initial commitment period to the non-dangerous individual who will never regain competency."); *United States v. Wheeler*, 744 F.Supp. 633, 636 (E.D.Pa.1990)("section 4246 establishes procedures to follow only with respect to those defendants whose release would create a substantial risk of danger to society.")

What is clear is that Duhon does not pose a "substantial risk of bodily injury to another person or serious damage to property of another" within the meaning of § 4246. The FCI's forensic evaluation concluded that there was only a 10% probability that Duhon would commit a sexual offense within the next ten years, and this risk could be "significantly reduced with supervision."[69] This finding is consistent with Dr. Lowe's earlier opinion.[70] Furthermore, Duhon was discharged from FCI on October 14, 1998 and has been free on bond since then. There have been no reported incidents since his release, nor were there any incidents prior to the one which is the subject of the indictment. Finally, it appears that a number of unique factors contributed to the subject incident,

**68.** Title 18 U.S.C. § 4246(a) is entitled "Hospitalization of a person due for release but suffering from mental disease or defect" and provides:

(a) Institution of proceeding.—If the director of a facility in which a person is hospitalized certifies that a person in the custody of the Bureau of Prisons whose sentence is about to expire, or who has been committed to the custody of the Attorney General pursuant to section 4241(d), or against whom all criminal charges have been dismissed solely for reasons related to the mental condition of the person, is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available, he shall transmit the certificate to the clerk of court for the district in which the person is confined. The clerk shall send a copy of the certificate to the person, and to the attorney for the Government, and, if the person was committed pursuant to section 4241(d), to the clerk of the court that ordered the commitment. The court shall order a hearing to determine whether the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another. A certificate filed under this subsection shall stay the release of the person pending completion of procedures contained in this section.

**69.** *Id.*

**70.** *See* discussion at pp. 5–6, *supra.*

and it is unlikely that they will be duplicated in the future.[71]

■ Where, as here, the court finds that the defendant's mental condition has not so improved so as to permit the trial to proceed and that the defendant's release would not create a substantial risk of bodily injury to another person or serious damage to the property of another, the dictates of due process do not allow additional commitment to the Attorney General's custody. Care for the mentally incompetent, where necessary, has historically been left to the states. The federal statutory framework for addressing competence was not intended to abrogate that state authority. The Supreme Court has held:

> * * * a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.

*Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). In upholding the constitutionality of the predecessor to § 4241 *et seq.,* the Tenth Circuit found that Congress did not intend to usurp the role of the States in caring for permanently incompetent or insane persons:

> The several states in their character as parens patriae have general power and are under the general duty of caring for insane persons. The prerogative is a segment of police power. In the exercise of such power, insane persons may be restrained and confined both for the welfare of themselves and for the protection of the public. And if the exactions of due process are met, such restraint and confinement do not violate any constitutional right of the individual. [citations omitted]. While the care of insane persons is essentially the function of the states in their sovereign capacity as parens patriae, and while the federal government has neither constitutional nor inherent power to enter the general field of lunacy, Congress has the power to make provision for the proper care and treatment of persons who become temporarily insane while in custody of the United States awaiting trial upon criminal charges, and to make provision for the care and treatment of federal prisoners who become mentally incompetent during their incarceration after conviction. [citations omitted].

*Wells, by Gillig v. Attorney General of the United States,* 201 F.2d 556, 559 (10th Cir.1953).

In a concurring opinion regarding commitment of a defendant under the United States Code in the District of Columbia, the court acknowledged the limited scope of § 4246:

> A serious question exists as to whether Congress possesses the constitutional power to enact a nationwide federal commitment procedure for all persons acquitted of federal crimes who raised an insanity defense. Congress has already legislated to confer upon the fed-

---

71. According to Dr. Blackburn's report (Court Exhibit 1, Rec. Doc. 25), Duhon was living in his trailer on his mother's property alone without difficulty or incident for approximately two years when two aunts, one of their boyfriends and his two female cousins moved in with him. According to Duhon, the boyfriend wore his underwear around the trailer and drank excessively; the girls were not watched very closely and were frequently allowed to run around the trailer naked. Duhon told Dr. Blackburn that no one would listen to his complaints that the children should be required to wear clothes. Although the report contains only Duhon's version of events, there appears to be no dispute that the cousins whose photographs form the basis of the charges were temporarily living in Duhon's trailer and left prior to Duhon's indictment.

eral courts a residual, emergency authority to commit persons, accused or convicted of committing federal offenses, to the custody of the Attorney General in the event that suitable arrangements with the person's state of residence for his care cannot be made. This expressly limited residual authority granted to the federal courts has never been extended to allow the commitment of persons acquitted of federal crimes. Because the power to act in the general field of lunacy is a power reserved to the states under the Tenth Amendment, and that full responsibility has been traditionally exercised by every state, it may be seriously doubted whether the federal police power legitimately could or should be extended to encompass every person acquitted on an insanity defense of federal crimes ...

*U.S. v. Cohen*, 733 F.2d 128, 151 (D.C.Cir.1984)(Justice MacKinnon, concurring).[72]

Accordingly, I conclude that the court has no statutory authority to commit Duhon to the custody of the Attorney General for any additional period of hospitalization. *United States v. Wheeler*, 744 F.Supp. at 639–640; *U.S. v. Rudisill*, 43 F.Supp.2d 1, 4–5 (D.D.C.1999).

### CONCLUSION

For the foregoing reasons, the undersigned concludes that Duhon is not competent to stand trial and will not attain such capacity in the foreseeable future, with or without hospitalization. The undersigned further concludes that Duhon does not pose a "substantial risk of bodily injury to another person or serious damage to property of another" within the meaning of § 4246. Further hospitalization of the defendant is therefore inappropriate.

---

72. The court went on to discuss the Supreme Court decision in *Greenwood v. United States*, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956) regarding whether Congress possesses the constitutional power to provide for the care and custody of an accused whose mental incompetence is or may be of permanent or indefinite duration and whether Title 18 U.S.C. §§ 4246–4248 (the predecessor statute to § 4241 *et seq.*) impermissibly encroached upon the state's 10th Amendment powers and violated the due process clause of the Fifth Amendment:

A fair reading of *Greenwood* compels the conclusion that the United States pursuant to its federal enforcement power may make provisions for the custody and care of persons charged with or convicted of federal offenses in the event suitable arrangements for their care and custody cannot be made with the states of their residence. Implicit in this latter provision is the recognition that the care and custody of the insane is basically a state function and duty and, barring some emergency situation, the federal government should not provide, outside the District of Columbia, for federal commitment, automatic or otherwise, of persons acquitted of federal offenses who have raised a successful insanity defense. The custody and care of such persons is a state obligation in most cases.

*U.S. v. Cohen*, 733 F.2d at 153.