UNITED STATES, Appellee

v.

Joshua D. FRY, Private
U.S. Marine Corps, Appellant

No. 11-0396

Crim. App. No. 201000179

United States Court of Appeals for the Armed Forces

Argued November 3, 2011

Decided February 21, 2012

STUCKY, J., delivered the opinion of the Court, in which RYAN, J., and COX, S.J., joined.  BAKER, C.J., filed a dissenting opinion, in which ERDMANN, J., joined.


Counsel


For Appellant:  Lieutenant Commander Brian L. Mizer, JAGC, USN (argued).


For Appellee:  Lieutenant Kevin D. Shea, JAGC, USN (argued); Brian K. Keller, Esq. (on brief); Colonel Kurt J. Brubaker, USMC.


Military Judges:  J. G. Meeks and John R. Ewers Jr.


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

United States v. Fry, No. 11-0396/MC

Judge STUCKY delivered the opinion of the Court.

We granted review to determine whether jurisdiction existed pursuant to Article 2, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 802 (2006), to try Appellant in a court-martial, despite an order from a California court that established a limited conservatorship over Appellant. We hold that jurisdiction existed pursuant to Article 2(c).[1]

I.

In accordance with Appellant's pleas, a general court-martial by military judge alone found Appellant guilty of two specifications of being absent without leave, four specifications of possessing child pornography, and fraudulent enlistment in violation of Articles 83, 86, and 134, UCMJ, 10 U.S.C. §§ 883, 886, 934 (2006). Appellant was sentenced to a bad-conduct discharge, confinement for four years, and forfeiture of all pay and allowances. The convening authority approved the sentence but suspended all confinement in excess of twelve months for twelve months in accordance with the pretrial agreement. The United States Navy-Marine Corps Court of Criminal Appeals (CCA) affirmed. United States v. Fry, NMCCA

---

[1] Oral argument in this case was heard at the Global Reach Conference Planning Center, Scott Air Force Base, Illinois, as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to

2

201000179, 2011 CCA LEXIS 5, at *14-*15, 2011 WL 240809, at *5
(N-M. Ct. Crim. App. Jan. 27, 2011) (unpublished).

A.

Appellant was sixteen years old and living in California when he met Gunnery Sergeant (GySgt) Matthew Teson, a Marine Corps recruiter, at a Young Marine function. When Appellant became an appropriate age for recruitment, GySgt Teson contacted Appellant. Appellant, however, was unavailable for enlistment because he was leaving the recruiting district for a school in Colorado for adolescents with psychiatric, emotional, or behavioral problems.

Before Appellant left for Colorado, his grandmother petitioned a California state court to establish a limited conservatorship over Appellant, because Appellant had autism,[2] had been arrested for stealing and carrying a "dirk or dagger," and was alleged to be unable to provide for his needs for health, food, clothing, or shelter. The petition further alleged that Appellant could not "control his impulsivity."[3] Based on these allegations, the California court, after an

_____

demonstrate the operation of a federal court of appeals and the military justice system.
[2] Evidence in the record indicated that Appellant has a high functioning variety of autism.
[3] One doctor diagnosed Appellant with an "impulse disorder, NOS [not otherwise specified]." Although the opinion may discuss Appellant's condition in other words, it is in light of this diagnosis.

uncontested hearing, entered an order that both restricted Appellant's ability to, and gave Appellant's grandmother the power to choose a residence, access confidential papers and records, contract, have the exclusive right to give or withhold medical treatment, and make all decisions concerning Appellant's education.

B.

When Appellant was approximately twenty years old, he returned from the Colorado school still subject to the limited conservatorship.  Shortly after returning, he contacted GySgt Teson about enlisting in the Marines.  After passing the Armed Services Vocational Aptitude Battery (ASVAB), certifying that he understood the terms of his enlistment, and obtaining his birth certificate and social security card from his grandmother, Appellant undertook the obligations, duties, and training of a Marine and, in turn, received pay and allowances.  Appellant initially had issues in basic training:  he stole peanut butter and hid it in his sock; he urinated in his canteen; he refused to eat; and he failed to shave and then lied about it.

During these struggles, Appellant visited the medical staff and informed the medical officer that he was autistic and an asthmatic.  When Appellant's limited conservator was called and asked about the autism diagnosis, she acknowledged that Appellant was autistic.  A medical officer informed the limited

conservator that Appellant would be sent home.  However, Appellant remained, because he indicated that he was motivated and desired to return to training and was found medically fit to do so.

After the incident in medical, Appellant returned to training and completed initial drill, first phase, the initial physical fitness test, second phase, rifle qualification, the series commander interview, final drill, and the Crucible[4] without a recorded incident.  The limited conservator not only voiced no explicit objection to Appellant's becoming a Marine, she also attended Appellant's graduation ceremony.  Appellant committed his offenses approximately two to three months after being assigned to routine duty while waiting to attend infantry school.  Appellant objected at trial that the court-martial lacked personal jurisdiction over him.

## II.

"Perhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces."  United States v. Standard Oil Co., 332 U.S. 301, 305 (1947), result superseded by statute,

---

[4] The Crucible is a fifty-four-hour test of a Marine recruit's skills that emphasizes teamwork, perseverance, and courage.  It is the final test before a recruit becomes a Marine.  The Crucible:  The Recruits' Final Test, United States Marine Corps, http://www.marines.com/main/index/making_marines/recruit_trainin g/training_matrix/the_crucible (last visited Jan. 25, 2012).

Medical Care Recovery Act, Pub. L. No. 87-693, § 1, 76 Stat. 593 (1962).  For this reason, "the scope, nature, legal incidents and consequences of the relation between persons in service and the Government are fundamentally derived from federal sources and governed by federal authority."  Id. at 305-06 (citing Tarble's Case, 80 U.S. 397 (13 Wall. 397) (1872); Kurtz v. Moffitt, 115 U.S. 487 (1885)).  Federal law, not state law, is the benchmark by which courts measure whether a person is subject to court-martial jurisdiction.  See United States v. Blanton, 7 C.M.A. 664, 665-66, 23 C.M.R. 128, 129-30 (1957).

Appellant, however, asserts that his situation is different.  He claims that the decision of the California court as to his capacity to contract is binding on courts-martial under the federal full faith and credit statute, 28 U.S.C. § 1738 (2006).  This statute, which dates to 1790, states that authenticated state judicial proceedings are entitled to the same full faith and credit in "every court within the United States" as they have in the courts of their own state.

We have our doubts that the full faith and credit statute was ever intended to import state statutory or case law into an enlistment contract, which is governed by federal law.  Standard Oil, 332 U.S. at 305; Lonchyna v. Brown, 491 F. Supp. 1352, 1353 n.1 (N.D. Ill. 1980); Colden v. Asmus, 322 F. Supp. 1163, 1164 (S.D. Cal. 1971).  In considering the issue, however, we remain

6

mindful of the Supreme Court's warning that "[c]ourts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). Here, determining whether court-martial jurisdiction existed pursuant to Article 2(b)[5] would require determination of important issues of federalism and comity, which are unnecessary since Article 2(c) offers an alternative means of resolving this case.[6]

III.

Article 2(c) provides that:

Notwithstanding any other provision of law, a person serving with an armed force who --

(1) submitted voluntarily to military authority;
(2) met the mental competence and minimum age qualifications of sections 504 and 505 of this title at the time of voluntary submission to military authority;
(3) received military pay or allowances; and
(4) performed military duties;

---

[5] Article 2(b) provides that "[t]he voluntary enlistment of any person who has the capacity to understand the significance of enlisting in the armed forces shall be valid for purposes of jurisdiction under subsection (a) and a change of status from civilian to member of the armed forces shall be effective upon the taking of the oath of enlistment."

[6] See generally the strictures on constitutional adjudication enunciated in Justice Brandeis' famous concurrence in Ashwander v. TVA, 297 U.S. 288, 341 (1936).

> is subject to this chapter until such person's active services has been terminated in accordance with law or regulations promulgated by the Secretary concerned.

Article 2(c), UCMJ (emphasis added).

Courts have generally recognized that the "notwithstanding" language is a clear statement of law indicating the obvious intent of the drafters to supersede all other laws. See Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993) (citing a number of circuit court opinions). The practical effect of the "notwithstanding" clause is that courts-martial need not concern themselves with the legal effect of other "clause[s] in . . . statute[s], contract[s], or other legal instrument[s]," when deciding whether they have jurisdiction. Black's Law Dictionary 1345 (9th ed. 2009) (defining "provision").

Congress has the power to override state law that would interfere with the servicemember-military relationship, given its distinctively federal character. See Standard Oil Co., 332 U.S. at 305; cf. Herrera-Inirio v. I.N.S., 208 F.3d 299, 307-08 (1st Cir. 2000) (holding, in the realm of immigration, that when Congress possesses plenary authority over the subject matter at issue, "it may freely displace or preempt state laws in respect to such matters") (citations omitted). Thus, in assessing whether the accused in this case met the mental competency requirements for jurisdiction pursuant to Article 2(c), the military judge was not bound by the California order, even

8

assuming it was directly on point.  The military judge was only required to review the relevant evidence, including the order, to determine whether the requirements of Article 2(c) were met.

IV.

A.

Our most recent and expansive discussion of Article 2(c) is United States v. Phillips, 58 M.J. 217 (C.A.A.F. 2003), in which we held that Article 2(c) sets out a three-part analytical framework for finding jurisdiction.  Id. at 220.  The threshold question is whether the person is "'serving with an armed force.'"  Id.  If that can be established, the analysis proceeds to the four-part test laid out in Article 2(c), which requires findings that the accused:  voluntarily submitted to military authority; met the mental and age requirements of 10 U.S.C. §§ 504 and 505; received military pay or allowances; and performed military duties.  Phillips, 58 M.J. at 220.  If all four parts of the test are met, then the person is subject to court-martial jurisdiction, until the person is released pursuant to law or regulation.  Id.  The only seriously contested issue here is whether Appellant was mentally competent, within the meaning of the statute.[7]

---

[7] Everyone, at all relevant times, acted as though Appellant was a validly enlisted, active duty member of the armed services. He was performing routine duties, in uniform, on a regular basis when he committed his offenses; thus, Appellant was serving with

Contrary to the dissent's suggestion, we recognize that voluntariness is a separate and distinct requirement under Article 2(c) and that it retains its usual meaning. Black's Law Dictionary, supra, at 1710-11 ("voluntary" is defined as "[d]one by design or intention" or "[u]nconstrained by interference; not impelled by outside influence"). Furthermore, voluntariness remains a question evaluated under the traditional rubric of looking at the totality of the relevant circumstances, including the individual's mental state. Cf. Brady v. United States, 397 U.S. 742, 749 (1970).

Evidence either that Appellant's actions were compelled by an outside influence, like duress or coercion, or that Appellant could not understand the nature or significance of his actions might be reasons to find that Appellant has not acted voluntarily. There is no evidence of duress or coercion in this case. Thus, we are left only to consider whether Appellant understood the nature or significance of his actions.

This question necessarily requires courts to consider Appellant's mental capacity, which inevitably overlaps with the mental capacity determination in Article 2(c)(2). If Appellant

---

the armed forces. Appellant has not argued that he was drunk or under duress when he attempted to enlist or continued to serve; as such, there is no basis to question the voluntariness of Appellant's actions. It is also beyond dispute that Appellant was old enough to enlist. He received pay and allowance and, as

had mental capacity under Article 2(c)(2), then it is surely evidence that he had the requisite mental capacity to understand the significance of submitting to military authorities, i.e., it would tend to show that he acted voluntarily in that regard.[8] Thus, we turn our attention to the question of mental competency.

B.

"'When an accused contests personal jurisdiction on appeal, we review that question of law de novo, accepting the military judge's findings of historical facts unless they are clearly erroneous or unsupported in the record.'" United States v. Hart, 66 M.J. 273, 276 (C.A.A.F. 2008) (quoting United States v. Melanson, 53 M.J. 1, 2 (C.A.A.F. 2000)). Whether Appellant is mentally competent is a question of fact, and we will only set aside findings of fact if they are clearly erroneous. Cf. United States v. Barreto, 57 M.J. 127, 130 (C.A.A.F. 2002)

---

noted above, performed routine duties. Finally, there is no evidence that Appellant was or has been released from service.
[8] While we sympathize with the dissent that mental disability encompasses a broad spectrum of conditions, and we recognize that Appellant might not have been an ideal candidate for military service, we, nevertheless, are tasked with determining whether Appellant can be held criminally liable after purportedly becoming a member of the armed forces. Even though an accused's location on the spectrum of mental disabilities may influence the result, whether the accused can be held criminally liable is a yes or no proposition, in that the accused either met the requirements for jurisdiction or he did not.

11

United States v. Fry, No. 11-0396/MC

(concerning mental competency to stand trial (quoting United States v. Proctor, 37 M.J. 330, 336 (C.M.A. 1993))).

Section 504 sets out the standard in relevant part as "[n]o person who is insane . . . may be enlisted in any armed force." 10 U.S.C. § 504(a). The general definition section states that "the word[] 'insane' . . . shall include every idiot, lunatic, insane person, and person non compos mentis." 1 U.S.C. § 1 (2006) (emphasis added). Non compos mentis requires something more than merely suffering from a mental disease; the concept envisions someone that is "'incapable of handling her own affairs or unable to function in society.'" Perry v. United States Dep't of State, 669 F. Supp. 2d 60, 66 (D.D.C. 2009) (quoting Smith-Haynie v. Dist. Of Columbia, 155 F.3d 575, 580 (D.C. Cir. 1998)); see also Webster's Third New International Dictionary 1536 (1986) (defining non compos mentis as "wholly lacking mental capacity to understand the nature, consequences, and effect of a situation or transaction").

The clear purpose of § 504 was to codify something approximating the common law concept of capacity to contract, in that only those people may enlist who have the ability to understand what it means to enlist. See S. Rep. No. 96-197, at 122 (1979), reprinted in 1979 U.S.C.C.A.N. 1818, 1827 (noting that the new subsection (b) overrules United States v. Russo, 1 M.J. 134 (C.M.A. 1975) "by reaffirming the law as set forth by

12

the Supreme Court in In re Grimley, 137 U.S. 147"); In Re Grimley, 137 U.S. 147, 150 (1890) (noting that enlistment creates a "contractual relation between the parties; and the law of contracts . . . is worthy of notice"); id. at 152–53 ("Of course these considerations may not apply where there is insanity, idiocy, infancy, or any other disability which, in its nature, disables a party from changing his status or entering into new relations.").

Given that the concept codified in § 504 is akin to capacity to contract, those events that occurred before and after enlistment are relevant to determining the person's mental condition on the date the enlistment was executed. Cf. Knott v. Pervere, 285 F. Supp. 274, 278 (D. Mass. 1968) (interpreting California law). Furthermore, "the weight of authority seems to hold that mental capacity to contract depends upon whether the allegedly disabled person possessed sufficient reason to enable him to understand the nature and effect of the act in issue. Even average intelligence is not essential to a valid bargain." Cundick v. Broadbent, 383 F.2d 157, 160 (10th Cir. 1967).

V.

The military judge concluded that jurisdiction existed pursuant to Article 2(c), and he specifically found Appellant mentally competent. In particular, the military judge concluded that Appellant had "the capacity to understand the significance

13

of his enlistment." Our review is limited to determining whether that conclusion was clearly erroneous. We find that it was not.

The Government called Dr. Bruce T. Reed to testify about Appellant's mental capacity. Dr. Reed had participated on Appellant's Rule for Courts-Martial (R.C.M.) 706 board that occurred prior to trial. In that role, he had personally interviewed Appellant and reviewed his medical records. The results of the board were that Appellant was able to appreciate the nature and quality of the wrongfulness of his conduct and that Appellant had sufficient capacity to stand trial and cooperate in his defense. In response to a question about whether Appellant understood the significance of his enlistment, Dr. Reed testified a "partial yes." When specifically asked if he would find that Appellant understood the significance of his enlistment by a preponderance of the evidence, he testified that "when you ask me 51 percent or more, I would have to say yes."

In contrast, the defense presented an affidavit from a psychologist, Dr. Julie E. Schuck, which stated in relevant part, "based upon my over ten years of clinical evaluation of [Appellant], do I believe that [Appellant] had the mental capacity to understand the significance of his enlistment in the military. My answer is no." That opinion was based on Dr. Schuck's belief that Appellant's decision to enlist was "driven

14

by his long-term perseveration with being in the military . . . and the impulsive decision to do something without remotely considering the long-term consequences and his limitations. . . . [Appellant] pursued this plan based solely on desire and gratification, without critical analysis and reasoning."

When faced with conflicting evidence on whether a party is competent, the military judge does not err merely because some evidence points in the opposite direction of the military judge's ultimate conclusion. See United States v. Morgan, 40 M.J. 389, 394 (C.M.A. 1994) ("Where there are underlying factual issues requiring resolution of conflicting testimony, the military judge's findings of fact will be upheld 'if fairly supported in the record'. . . .") (citations omitted); In Re Rains, 428 F.3d 893, 902 (9th Cir. 2005) ("In the face of conflicting testimony, the bankruptcy court did not clearly err in discounting the theoretical speculation of Rains's experts, or in finding that Rains was mentally competent to enter into the settlement agreement."). Even though the military judge did not specifically cite either expert witness's testimony in his written findings or analysis, he acknowledged that Appellant had been diagnosed "'as suffering from obsessive compulsive symptoms . . . and [that Appellant] cannot control his impulsivity,'"

15

which were conclusions generally presented by Dr. Schuck's affidavit and other evidence presented by defense counsel.

The military judge concluded, however, that the surrounding circumstances did not sufficiently support the claim of impulsivity, assuming impulsivity alone would be enough to invalidate a contract, because "the accused largely (and ultimately) managed to conform his conduct to the requirements of the law (and orders and directives) throughout recruit training . . . ." The military judge also relied on the fact that Appellant passed the ASVAB and that Appellant overcame his initial struggles and successfully completed training without further negative reviews, which tended to show that Appellant could and did understand the need to conform his conduct to the standard set out for all Marines.

In regard to the California court order, the military judge found that "[i]n toto, the evidence indicates that the probate court's findings, while not perfunctory, provide little support for a presumption, much less a finding, that for the purposes of Article 2, UCMJ, the accused did not have the capacity to understand the significance of his enlistment." This conclusion makes sense in the context of California law, that "[t]he

conservatee of the limited conservator shall not be presumed to be incompetent . . . ." Cal. Prob. Code § 1801(d) (West 2011).[9]

Admittedly, the military judge may have overstated matters when he claimed that "all of the evidence" pointed in one direction. But when reviewed as a whole, the military judge's ruling indicates that he considered contrary evidence and ultimately found in the face of conflicting views that the evidence better supported a finding that Appellant was mentally competent and acted voluntarily. The military judge's findings that Appellant met the requirements for jurisdiction under Article 2(c) are fairly supported by the record and, thus, are not clearly erroneous.

VI.

The judgment of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

---

[9] The military judge also found that the limited conservator did not object to Appellant's enlistment, although she did voice her reservations and hostility to the idea. Although this conclusion is supported by the record, it is not an essential finding, since courts-martial are not bound by orders like the one in issue when determining whether the requirements of Article 2(c) are met.

United States v. Fry, No. 11-0396/MC

BAKER, Chief Judge, with whom ERDMANN, Judge, joins (dissenting):

SUMMARY

The military judge concluded that "[a]ll of the evidence indicates that the accused had at and since the time he took the oath of enlistment the de facto capacity to contract and the actual capacity to understand the significance of enlisting in the armed forces."  The military judge further concluded that "[a]ll of the evidence indicates that the accused's enlistment was voluntary" for the purpose of establishing personal jurisdiction.  The military judge committed two errors in reaching these conclusions.

First, "all of the evidence" does not indicate that Appellant had the capacity to enlist or do so voluntarily.  Indeed, the evidence provided by Appellant's psychologist indicates the opposite.  Among other things, she stated in a declaration that:

> As a result of his conditions, he is preoccupied with meeting his immediate needs at the risk of his long-term benefits.  His brain does not utilize critical thought and reasoning, as demonstrated by his impulsive behavior.  Due to his autism and ADHD, [Appellant] fails to weigh the consequences of his actions. . . .
>
> . . . .
>
> I have been asked whether in my professional opinion, and based upon my over ten years of clinical evaluation of [Appellant], do I believe that [Appellant] had the mental

> capacity to understand the significance of his enlistment
> in the military.  My answer is no.

Nevertheless, this and other evidence running counter to the

Government's position was not addressed in the military judge's

analysis of Appellant's motion to dismiss.  Thus, we cannot know

if he reached the right decision regarding jurisdiction, because

he did not reach it the right way -- by analyzing and weighing

all the evidence before the court, including and in particular,

the testimony and declaration of Appellant's long-term treating

psychologist.

Neither did the military judge define the critical concept

at issue in this case:  What it means to "voluntarily enlist."

Ordinarily, a military judge is presumed to know the law and

apply it correctly.  United States v. Rodriguez, 60 M.J. 87, 90

(C.A.A.F. 2004).  However, in the absence of a statutory

definition, case law, or a definition agreed to by the parties

at trial, we cannot determine if the military judge applied the

correct standard, or even what standard he used in applying

Article 2(c)(1), Uniform Code of Military Justice (UCMJ), 10

U.S.C. § 802(c)(1) (2006).

To the extent the military judge equated the capacity to

enlist with the simple presence or absence of insanity, he

erred.  As in the plea context, the capacity to do something

voluntarily requires contextual analysis, not a simple

determination that someone is legally sane.  As recognized by the United States Supreme Court and this Court, this is especially important where the spectrum of developmental disorders is at issue.

As a result, the military judge abused his discretion in ruling on the defense motion to dismiss and I respectfully dissent.

## BACKGROUND

Appellant was diagnosed with autism in 1996.  He was subsequently diagnosed with obsessive compulsive symptoms, attention deficit hyperactivity disorder (ADHD), and oppositional defiant disorder (ODD).  In 2006, he was sent to the Devereux Cleo Wallace Center in Denver, Colorado, after being expelled from his high school and in exchange for dismissal of related criminal charges for burglary, receiving stolen property, and carrying a dirk or dagger.  The facility is a lockdown facility designed to treat children and adolescents who have "significant mental health and behavioral needs."

In January 2008, Appellant enlisted in the United States Marine Corps.  At the time of his enlistment the United States Marine Corps knew or should have known that Appellant was not a suitable candidate for service.  All parties to this case and the military judge, and the Court of Criminal Appeals agree on this fact.

Dr. Julie Schuck is a psychologist who treated Appellant as a patient for autism, ADHD, ODD, and a conduct disorder over a ten-year period between 1997 and 2006.[1]  Dr. Schuck declared that Appellant's autism manifests itself in a fixation on military fantasy and impulsive behavior, including an inability "to weigh the consequences of his actions."  Specifically, she stated the following in a declaration to the court:

> [Appellant] maintains significant limitations in his ability to make non-superficial social connections. Also, as a result of his conditions, he is extremely impulsive, lacking judgment and reasoning skills necessary to make daily life decisions. Developmentally, he is mentally like a child at the age of 14.  As a result of his conditions, he is preoccupied with meeting his immediate needs at the risk of his long-term benefits.  His brain does not utilize critical thought and reasoning, as demonstrated by his impulsive behavior.  Due to his autism and ADHD, [Appellant] fails to weight the consequences of his actions.  His pursuit of gratifying his immediate needs fueled by his impulsivity have resulted in a long history of poor choices that evidence his lack of judgment and reasoning skills necessary to make life decisions.
>
> . . . What makes [Appellant's] situation even more complicated is that his perceptual accuracy and reality testing are impaired, meaning he believes he

---

[1] There is some inconsistency in the record as to when Appellant was initially diagnosed and the length of Dr. Schuck's treatment.  Ms. Fry's declaration indicates that Fry was diagnosed in 1995 at the age of seven.  The record indicates that Dr. Schuck treated Fry between 2000 and 2006, which would be a six-year period rather than a ten-year period.  However, Dr. Schuck's declaration provides that the treatment period was January 1997 through November 2007, with a break in treatment between July 2006 and October 2007, which would mean a total treatment period of just under ten years.

can take on more challenging tasks than he is capable of.
. . . Given the limitations that I have described, [Appellant] is unable to independently handle his daily personal affairs, make important decisions, or manage his own money without significant structure and supervision.  His plans and priorities focus on his immediate and often unrealistic desires, not on what is in his best interest in the long run.

She also testified before the court reiterating what was in her declaration, including that Appellant suffered from autism, ODD, a conduct disorder, and ADHD, which is characterized by symptoms including "impulsivity and hyperactivity making it hard for him to make . . . thought out decisions."[2]  She explained that a key obstacle for an individual with autism is impulse control, and that a large focus of treatment for autism is improving impulse control.[3]

At the time of Appellant's enlistment, the Marine Corps recruiter knew or should have known that Appellant's grandmother

---

[2] The Government's psychologist, Captain Bruce T. Reed, also testified at trial and, after stating "I'm going to hedge a bit," indicated his belief that there was at least a fifty-one percent chance that Appellant understood the significance of enlisting.  However, Dr. Reed had not treated Appellant for any period of time, was not familiar with Appellant's full history or medical records, and did not know Appellant was subject to a conservatorship.  More importantly for the purpose of this dissent's analysis, the military judge did not address or weigh Dr. Reed's testimony against the testimony and declaration of Dr. Schuck.

[3] The Government argued on appeal that Dr. Schuck's testimony contradicted her declaration and retreated from its position.  That is not how I read the testimony, which is reproduced as Appendix A to this opinion.  The declaration is reproduced in Appendix B.

had a limited conservatorship over Appellant and that Appellant had been treated for fifteen months in a mental health facility in Colorado for behavioral problems.  All parties to this case and the military judge agree on this fact.  The exercise of due diligence would also have revealed that while at the Colorado facility, Appellant received "psychiatric care and counseling to deal with [his] desire to view child pornography."

In 2009, Appellant was tried by general court-martial for several offenses including fraudulent enlistment for deliberately concealing that he had received psychiatric care and counseling to deal with his desire to view child pornography.

The question before this Court is whether Appellant was subject to the personal jurisdiction of a military court-martial.  As the majority correctly concludes, this is a question of federal law, not state law.[4]  Under the Supremacy Clause, laws enacted by the United States pursuant to the Constitution are "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary

---

[4] As a result, I need not and do not reach a conclusion as to whether or how the Full Faith and Credit Clause applies only with respect to the state court proceeding.  Whatever effect is given to the state court proceeding, if any, the question before this Court is whether the military judge erred in applying Article 2, UCMJ.

notwithstanding."  U.S. Const. art. VI.  Indeed, the Supremacy

Clause was designed:

> to avoid the introduction of disparities, confusions
> and conflicts which would follow if the Government's
> general authority were subject to local controls.  The
> validity and construction of contracts through which
> the United States is exercising its constitutional
> functions, their consequences on the rights and
> obligations of the parties, the titles or liens which
> they create or permit, all present questions of
> federal law not controlled by the law of any state.

United States v. Allegheny County, 322 U.S. 174, 183 (1944)

(overruled on other grounds).  Just as "it would make little

sense to have the Government's liability to members of the Armed

Services dependent on the fortuity of where the soldier happened

to be stationed at the time of the injury," Stencel Aero Eng'g

Corp. v. United States, 431 U.S. 666, 671 (1977), so too it

would make little sense for the interpretation of an enlistment

contract to depend on the fortuity of where the soldier happened

to be when the enlistment contract was signed.

"When an accused contests personal jurisdiction on appeal,

we review that question of law de novo, accepting the military

judge's findings of historical facts unless they are clearly

erroneous or unsupported in the record."  United States v.

Melanson, 53 M.J. 1, 2 (C.A.A.F. 2000).

ANALYSIS

Article 2, UCMJ, governs the validity of enlistment for the

purpose of determining who is subject to the UCMJ.  Subsection

7

(b) of the article states that "[t]he voluntary enlistment of any person who has the capacity to understand the significance of enlisting in the armed forces shall be valid for purposes of jurisdiction." Article 2(b), UCMJ, 10 U.S.C. § 802(b). Thus, by implication the text and case law indicates, if a person does not have the capacity to understand the significance of enlisting then a court-martial shall not have jurisdiction.

However, subsection (c) establishes jurisdiction "[n]otwithstanding any other provision of law" when four conditions are met:

a person serving with an armed force who --

(1) submitted voluntarily to military authority;

(2) met the mental capacity and minimum age qualifications of sections 504 and 505 of this title at the time of voluntary submission to military authority;

(3) received military pay or allowances; and

(4) performed military duties.

Article 2(c), UCMJ, 10 U.S.C. § 802(c). Appellant satisfied the second, third, and fourth of these conditions. The question before the military judge was whether Appellant had the capacity to voluntarily enlist. Because Article 2(c), UCMJ, applies "[n]otwithstanding any other provision of law," in theory, one could lack the capacity to understand the significance of enlisting for the purposes of subsection (b), but nonetheless

8

voluntarily submit to military authority for the purpose of subsection (c)(1).  But that would depend on the meaning of "voluntarily" in subsection (c)(1) and the extent to which it is coterminous with a "capacity to understand the significance of enlisting in the armed forces."

This critical term is not defined in this section of the UCMJ.  Nor is the meaning of voluntarily for the purpose of Article 2(c)(1), UCMJ, addressed or defined in case law.  At oral argument and in their briefs, the parties defined the term with reference to dictionary definitions and plain English descriptions.  They did not agree on its meaning.  The military judge did not state or provide a definition in his ruling.  The majority fills this void by equating a lack of voluntariness with either duress and/or coercion or "the concept [of insanity] codified in § 504 [which] is akin to [the] capacity to contract."[5]  United States v. Fry, __ M.J. __ (13) (C.A.A.F. 2012).  In other words, unless a person is coerced, drunk, or

---

[5] Section 504 states:

> Insanity, desertion, felons, etc. -- No person who is insane, intoxicated, or a deserter from an armed force, or who has been convicted of a felony, may be enlisted in any armed force.  However, the Secretary concerned may authorize exceptions, in meritorious cases, for the enlistment of deserters and persons convicted of felonies.

10 U.S.C. § 504(a) (2006).

insane he or she has the capacity to understand the significance of enlisting and voluntarily submitting to military authority.

As both sides of the debate recognize, mental capacity and not coercion is the issue at stake in this case. However, there is disagreement on whether the concepts embedded in 10 U.S.C. § 504 are "akin to" and determinative of the "capacity to contract." In my view, the definition fails for four reasons. First, Congress placed the reference to the 10 U.S.C. § 504 insanity standard in a separate subsection of Article 2(c), UCMJ, thus the act of doing something voluntarily for the purpose of subsection (1) must mean something more than that one meets the "mental competence" requirement for the purpose of subsection (2). In other words, interpreting "voluntarily" in subsection (1) to mean the same thing as "mental competence" in subsection (2), as the majority does, violates "a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or significant." TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001).

Second, hinging the capacity to "submit voluntarily to military authority" on the insanity prohibition of section 504 turns the nuance of mental health and the spectrum of developmental disabilities into a yes or no question, rather than the spectrum of conditions that actually exists. See Dep't

10

of Defense Instr. 6130.03 Medical Standards for Appointment, Enlistment, or Induction in the Military Services encl. 4 para. 29 (Apr. 28, 2010 (incorporating Change 1, Sept. 13, 2011)) [hereinafter DoD I 6130.03].[6]  Thus, while the § 504 standard may offer clarity and simplicity for lawyers, it does not reflect the range of mental health conditions and disabilities that may actually affect the capacity of recruits to voluntarily enlist.

Third, such a standard is inconsistent with the approach of the Supreme Court and this Court in assessing whether pleas are voluntary.  Voluntary is a term familiar to the plea process if not to Article 2, UCMJ, jurisprudence.  Waiver of a guilty plea must be not only "voluntary" but also "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."  Brady v. United States, 397 U.S. 742, 748 (1970).  The voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it."  Id. at 749.  To ensure that a plea is voluntary and to prevent improper terms being imposed:

> the military judge must assure on the record that the accused understands the meaning and effect of each

---

[6] The regulation refers to autism as "autistic spectrum disorders."  For our purposes, it does not matter where Appellant fell on the autism spectrum since the military judge's error was not based on where Appellant fell on the spectrum, but in failing to define the term "voluntary" and in failing to address and analyze all the evidence before the court regarding Appellant's capacity to voluntarily submit to military authority.

> provision in the pretrial agreement; as well as make sure that the written agreement encompasses all the understandings of the parties and that they agree with his interpretation of the plea bargain.

United States v. Bartley, 47 M.J. 182, 186 (C.A.A.F. 1997) (quoting United States v. Jones, 23 M.J. 305, 308 (C.M.A. 1987)) (emphasis added). Certainly, this Court has not upheld or rejected pleas solely on the basis of whether a person has been deemed sane.

Though it is true that one who is insane cannot act voluntarily, that does not prove the corollary that someone who is sane always acts voluntarily. Rather, where bipolar conditions are in play, for example, the Court has looked to how a particular condition affects the accused to determine whether pleas are knowing and voluntary. In United States v. Harris, for example, we held that an accused's plea was improvident where some of the conflicting post-trial evidence demonstrated that he had been unable to appreciate the wrongfulness of his conduct. 61 M.J. 391, 393, 398-99 (C.A.A.F. 2005). In United States v. Shaw, however, we concluded that the "mere possibility" of a conflict with a guilty plea was raised where an accused had merely claimed he suffered from bipolar disorder but presented no additional evidence that he in fact suffered from the condition or that it raised a substantial question

regarding his mental responsibility.  64 M.J. 460, 464 (C.A.A.F. 2007).

Courts are especially careful in evaluating pleas in the case of developmentally disabled persons to ensure that they are voluntary.  See, e.g., Gaddy v. Linahan, 780 F.2d 935, 945-47 (11th Cir. 1986) (holding that the trial judge had not adequately explained the nature of the crime and its elements to satisfy due process where the defendant was "illiterate and possesses minimal mental capacity" and "[h]is own attorney characterized him as 'mentally retarded to some degree'"); United States v. Duhon, 104 F. Supp. 2d 663, 671 (W.D. La. 2000) (noting the need for sensitivity to the differences between mentally ill and "mentally retarded" defendants in assessing competency).

Finally, equating capacity and voluntary action to insanity runs counter to our common understanding of not only developmental disabilities but the plain meaning of what it means to act in a voluntary manner.[7]  A voluntary act has been

---

[7] Department of Defense regulations now prohibit individuals with autism from joining the armed forces:  "Unless otherwise stipulated, the conditions listed in this enclosure are those that do NOT meet the standard by virtue of current diagnosis, or for which the candidate has a verified past medical history." DoD I 6130.03 encl. 4 para. 2.  One such condition is "[p]ervasive developmental disorders . . . including Asperger Syndrome, autistic spectrum disorders, and pervasive developmental disorder -- not otherwise specified."  Id. at para. 29.C.

13

defined as an act that is "[d]one by design or intention." Black's Law Dictionary 1710 (9th ed. 2009). A person cannot knowingly and voluntarily do something if that person does not have the capacity to understand what he or she is doing.

In this case, the military judge did not define the term "voluntarily" and therefore we do not know against what measure of "voluntary" Appellant's condition was adjudicated. In the absence of an agreed-upon or understood definition, and in the context here, this was an abuse of discretion. In any event, determination as to whether an action has been taken in a voluntary manner requires individual adjudication of a particular person's condition and circumstance, not per se reference to § 504.

Thus, the military judge also abused his discretion in analyzing the facts. First, the military judge plainly erred when he concluded that "[a]ll of the evidence indicates that the accused's enlistment was voluntary." He also concluded that there was "no evidence" that Appellant's enlistment was involuntary. The majority concedes that one of these statements is inaccurate, but dismisses the military judge's repeated conclusions as no more than "overstat[ing] matters" and negated because "the military judge considered contrary evidence." But if the military judge considered contrary evidence it is not

14

reflected in the record or in the use of the unambiguous term "all."

Most importantly, there is no indication in the military judge's ruling that he considered and analyzed the medical testimony and declaration from Dr. Schuck. This was an abuse of discretion in a case that hinged on whether a developmentally disabled recruit had the capacity to voluntarily enlist and/or submit to military authority. In particular, the military judge abused his discretion by failing to address statements by Appellant's treating psychologist such as:

> Developmentally, [Appellant] is mentally like a child at the age of 14. . . . Due to his autism and ADHD, Josh fails to weigh the consequences of his actions. His pursuit of gratifying his immediate needs fueled by his impulsivity have resulted in a long history of poor choices that evidence his lack of judgment and reasoning skills necessary to make life decisions.
>
> . . . .
>
> . . . I have been asked whether in my professional opinion, and based upon my over ten years of clinical evaluation of Josh, do I believe that Josh had the mental capacity to understand the significance of his enlistment in the military. My answer is no.[8]

---

[8] Neither did the military judge reference or address the investigating officer's (IO) conclusion that:

> [i]t is highly questionable whether the Accused had the mental capacity at the time of enlistment to form the specific intent necessary to "deliberately conceal" his mental disorder. Further, there is compelling evidence in mitigation of undue influence, overreaching, and recruiter misconduct, all of which may negate the specific intent required for [a charge of fraudulent enlistment].

15

United States v. Fry, No. 11-0396/MC

In my view, it was not possible for the military judge to reach an informed conclusion about Appellant's capacity to enlist as well as to voluntarily submit to military authority without first acknowledging, analyzing, and addressing these critical statements.  Thus, we cannot know if the military judge reached the right decision regarding jurisdiction, because he did not reach it the right way -- by stating the standard he was applying and then analyzing and weighing all the evidence before the court, including and in particular, the testimony and declaration of Appellant's long-term treating psychologist in light of that standard.  As a result, I would reverse the decision of the lower court and respectfully dissent.

---

While not error in its own right to omit such reference, the IO's report clearly undercuts the conclusion that all the evidence reflected a capacity to voluntarily enlist.

# Appendix A

I want to note for the record I was confused by your argument. Clearly what you were telling me, Mr. Studenka, was that you didn't want me to consider the assumed underlying behavior that would require the counseling as uncharged misconduct.

CC:        That's correct, sir.

MJ:        I certainly will not consider that in determining a sentence in this case.

CC:        Yes, sir. Thank you.

MJ:        We've got Dr. Schuck on the phone?

CC:        We do, sir.

MJ:        Okay. Why don't we unmute her.

[The defense counsel complied.]

CC:        Dr. Schuck, are you there?

WIT:       Yes, I am.

CC:        I'm going to turn you over to -- the judge or the prosecutor may swear you in here in a moment and then you're going to testifying, okay.

           And just to complete this, sir, I didn't have a chance to give her the whole scoop, but obviously in the room now are the military judge, Colonel Ewers, a court reporter, all the defense team as you're aware, Major Marshall as the prosecutor, Mary Beth Fry and several spectators, none that I particularly recognize.

**Dr. Julie E. Schuck, a civilian, was called as a witness by the defense, was sworn, and telephonically testified as follows:**

**DIRECT EXAMINATION**

Questions by the prosecution:

Q.         Dr. Schuck, could you please state your full name spelling your last.
A.         My full name is Julie Elliott Schuck, last name S-C-H-U-C-K.

305

Q.      And what city and state are you a resident?
A.      I'm a resident to Huntington Beach, California.

TC:     Thank you.

CC:     Thank you, sir.

**Questions by the defense counsel:**

Q.      Dr. Schuck, could you please -- what's your current occupation?
A.      I am a licensed psychologist in private practice in the State of California.

Q.      And how long have you been a licensed psychologist.
A.      I've been licensed since 1197.

Q.      Ma'am, I just want to give the military judge a little bit of your background. What training and experience and education have you received in the area of psychology?
A.      Well, I received my Ph.D. from the California School of Professional Psychology in San Diego in 1993. I began working in the field actually in 1987 and I began working at the University of California Irvine Child Development Center which is a special day treatment program for children with severe behavioral disorders. In my capacity there, I did work at the Child Development Center for 11 years and my roles ranged from social skills coordinator to the school intervention coordinator. I was a therapist consultant on a nation wide treatment study program for children with attention deficient hyperactive disorder, as well as the staff psychologist overseeing and supervising the staff in conducting all the parent training for the program.

Additionally, I worked as a psych assistant where I saw -- I conducted groups and individual and family sessions under the supervisor of a licensed psychologist and then in 1997 when I received my license I was officially in private practice and have been so ever since.

My private practice I specialize in group social skills training for kids with attention deficient hyperactivity disorders, as well as kids on the autistic spectrum. I do a lot of school based interventions working with teachers and professionals working with these children

306

and a tremendous amount of parent training and family work to help everybody get along as best they can.

Q.   Okay.  Are you currently in good standing with the California State Board of Psychology?

A.   Yes, I am.

Q.   Are there any -- since you obtained your license, are there any continuing education requirements for you as a psychologist?

A.   Yes.  Every two years I'm required to take 36 hours of professional training in approved courses through the State of California.

Q.   And have you ever been subject to any disciplinary action through the California State Board of Psychology?

A.   No, I have not.

Q.   Now, you said a few things that you do currently in your private practice.  I just want to give the judge a sense of the extent of your private practice.  What -- first of all, how many patients a week do you currently see?

A.   On the average, I see between 20 and 30 patients a week.

Q.   And how many patients in total have you seen as a psychologist?

A.   You know, I'd have to estimate.  I would say over 1500.

Q.   Now, you mentioned a few things that you -- I guess your practice specializes in.  Is that -- you said group social skills?

A.   That's correct.

Q.   What is it?

A.   The majority of my practice children are referred for group social skills training and that is an opportunity for kids with -- similar ages to come together in a very structured and positive environment where I use behavior modification to work on their behaviors or on a point system and a level system and all the while they're learning a variety coping strategies and ways to get along with peers and adults, things that not easily come as easy for kids with autism or with behavioral disorders.

Q.   Now, you previously mentioned that you often deal with kids on the autistic spectrum, correct?

A.   That's correct.

307

Q.        What does that mean, the autistic spectrum?
A.        Well, it's, you know, there is quite a big spectrum. Some you can even look at -- some use the description of sort of a rainbow. On one end you have the very low functioning autistic child who has no language, who has no way to interact, who is also very low on intelligence which, you know, we considered mentally retarded. Then you have the very high end where you have some very gifted, intelligent people who are quite intelligent. However, their social interactions are -- still remain gravely impaired or qualitatively impaired and their communication skills are qualitatively impaired, and sort of the hallmark is they still may engage in either restricted or repetitive patterns of behavior or interests.

Q.        Well, what is autism?
A.        Well, for a child to be diagnosed with autism, there has to be evidence that there is a qualitative impairment in their social interaction, they have great difficulty carrying on a conversation, giving eye contact, using facial expression, they can't maintain sort of age appropriate relationship. They have to have a qualitative impairment in communication. There has to be a significant delay in the acquisition of language and, again, they have to have this -- evidence of this stereotypic or repetitive behavior or a restrictive range of interest.

Q.        Now, you said qualitative impairment. What do you mean by that?
A.        That means compared to a typical person, and in the field we call them, you know, neuro-typicals, they are, you know, vastly and obviously different. On the high end and with high function autism, they can blend in much more and particularly with a number of interventions we have for children on the spectrum. They can begin to blend in more and more socially where sometimes people wouldn't know unless you're trained.

Q.        Can autism be cured?
A.        Autism cannot be cured.

Q.        Can somebody with autism be treated to improve?
A.        Yes.

Q.	And can you explain that to the military judge?
A.	Well, that's -- my ultimate goal is to help these individuals maintain their authenticity but be able to blend in in our social world. So learn -- they have to work extra hard to learn the social skills that we sort of naturally picked up as neuro-typical. So they need a lot more practice and they need a lot more instruction and breaking being it down because from an early age that wasn't their interest. They were not interested as infants in faces. They're interested in objects.

Q.	Okay. Well, Dr. Schuck, do you know Josh Fry?
A.	Yes, I do.

Q.	Okay. And how is it that you know Josh?
A.	I began working with Josh in June of 2000. He was referred to me specifically for social skills training by Dr. Christine Iverson who is one of the many professionals that has worked with Josh over the years upon him coming to live with Mary Beth. She recommended social skills training and Mary Beth followed up and he entered into my program shortly after the initial evaluation in June.

Q.	Now, just to be clear, are you saying that he was referred to you based upon the diagnosis of Dr. Iverson?
A.	Well, actually he was diagnosed even earlier on by Dr. Pauline Filipec who is, you know, a national expert in the field of autism, and he'd been seen and evaluated and in many, many treatment programs prior to him coming to my office.

Q.	And I may have stepped over this, but what was the diagnosis that he had received prior to coming to you?
A.	Oh, he was diagnosed with autism.

Q.	Okay. You said he came to you in 2000. How long -- or what was the extent of your treatment of Josh?
A.	Well, I saw Josh primarily for group social skills training. However, I was also very involved in the educational component. I attended the majority of Josh's school meetings, which are called IEPs. I also worked with him individually and with Mary Beth to work on home programs to help them get along and generalize his skills he's learning from group into the real world, which is a difficult task.

309

Q. Okay. In total, through all of that, that help and assistance and treatment, how many years did you actually have Josh as a patient?

A. Oh, gosh. Well, I've been apprised of the -- I haven't seen Josh in some time, so I really -- it's been since probably 2006. But I have been consulting with Mary Beth throughout, kind of overseeing the case throughout his treatment.

Q. Okay. Well, I guess what I'm trying to get -- so the military judge understands, you treated Josh from 2000 to when? About 2006?

A. Yes.

Q. Okay. And during that period you were doing the group skills training and parent skills and also the school intervention that you described?

A. Yes, and it all varied because, you know, the history, depending upon what his needs were and he was receiving services from County Mental Health as well. So it was really -- we just made the decisions based on his -- the current needs that he had.

Q. Okay. Now, as part of your treatment of him for the things you've already described, would you also assess him yourself, and that is, you know, make a diagnosis yourself?

A. Well, I'm always assessing and diagnosing, you know, with any of my patients, just really not anything that might come up.

Q. Okay. And what diagnosis have you made of Josh during your treatment?

A. Well, with my, you know, extensive experience with Josh, he also meets criteria for attention deficit hyperactivity disorder which is characterized by a number of symptoms of inattention, inability to concentrate, as well as symptoms of impulsivity and hyperactivity making it hard for him to make decisions, thought out decisions. He also meets criteria for oppositional defiant disorder which is an individual who tends to argue when denied own way, argue with adults, blames others and has difficulty taking responsibility for actions. And, you know, prior to him going away to a residential facility he met criteria for conduct disorder because of the multiple stealing and lying and staying out in the evening. So those would be a diagnosis that he would meet criteria for.

310

Q.  Did you also diagnose him with autism yourself?
A.  Yes.  I mean, he -- like I said, although he has changed from I would say low functioning in the beginning to more high functioning, yes.

Q.  Well, let's talk about in the beginning.  When Josh came to you initially what led you to diagnose him as autistic?
A.  Josh had significantly impaired social relations.  He had great difficulty maintaining conversations with kids his own age, giving eye contact.  There's a high frequency of silly and odd and age inappropriate behaviors that would set him apart.  In terms of greetings and showing interest in others, it was significantly delayed.  He also had behavioral accesses such as verbal aggression and, again, sort of the silly and odd inappropriate behavior.  He -- and so those were his -- the history and the goals revolved around the social interactions and the communication, and also keeping in check his repetitive or -- his interest in -- his specific interest in specific topics.  So he's sort of preoccupied with special interests and Josh's special interest tended to revolve around police work, fire services, and the military.

Q.  Okay.  Now, during the course of your treatment did you see any signs that Josh's symptoms improved?
A.  There were a great deal of improvement.  Josh responds to my program right from the get-go.  The major improvements occurred with his social relations, being able to listen to somebody, give eye contact, have facial expressions, show interest, greetings.  I mean, he really, really improved very quickly in this area.  A he also greatly improved in reducing his silly and odd and age inappropriate behavior.

Q.  And any of those improvements changed your diagnoses that you previously indicated you've made?
A.  No.

Q.  Now, we're going to hear some testimony in a moment about a plan for Josh in terms of further treatment and I know I've consulted with you, as has Mary Beth Fry.  As one who has treated Josh in the past, do you have any thoughts or opinions as to Josh's ability to respond to future treatment as it relates to say child pornography?
A.  I think he has a good chance of responding well to a treatment program as he has in the past.  A restricted,

311

very well supervised and intensive program he has respond very well. When he was younger just being able to be in a positive environment where he was recognized for all the good choices he was making really benefited him. But definitely it's critical that he be in a very structured, intense treatment environment.

CC: Okay. Well, I thank you for your time, Doctor. Major Marshall or the judge may have some questions for you.

TC: No questions from the government, sir.

MJ: Dr. Schuck, just wait. I just need to make sure I don't have any questions. This is Colonel Ewers. Can you just sit tight for a second, please.

WIT: Absolutely.

### EXAMINATION BY THE COURT

**Questions by the military judge:**

Q. It occurs to me, Dr. Shuck, that the very thing that you say constitutes a diagnosis of autism is the chief obstacle to successful treatment. Is that a fair statement?
A. In terms of like the ability to empathize, that piece?

Q. Yeah, that and the -- it's impulse control and it's what you need to teach, as you do with all children presumably, is impulse control. Is that the focus of your treatment?
A. That's a large focus of the treatment that -- that I provide is learning that which it can be learned but it's a lot more difficult.

Q. You said that there's no cure for autism but as with maybe ADHD is autism something that tends to get better with age?
A. It can and I've actually also seen it get worse. It depends on what the individual is receiving in terms of services and each case is uniquely different. And that's the same for ADHD or any of the mental health disorders, you know. They can move and progress in a way so that they no longer are causing as much impairment in their life, but they can easily regress as well.

312

Q.   Will you just tell me again what appeared to be the key to the successes that you saw in Private Fry's treatment?

A.   The key -- one of the keys was the positive interactions he was receiving. So a lot of times these individuals spend their life getting corrected because there's so much to correct. So the emphasis on what is going right, what strengths you have to build on, were key. Throughout my history of working with Josh, he's been -- he's almost always been very respectful and compliant and I think it's largely to do with the amount of positive interaction I have had with him. But the other component is the structure and the supervision. He was most successful throughout the time that I treated him when he had those three components, the positive interaction, the structure, and the supervision so that he could develop that pattern of making good choices over and over again and get the nature reinforcement of what comes from those good choices.

Q.   So would you say that the -- what you called repetitive behavior or range of interests, is that something that internally evens out or is it simply you fix those by ensuring that they're responding the proper stimuli?

A.   Well, it's almost like a balance like for -- pretty much for any of us, you know. If he's so preoccupied that he can't do other things like maintain a job, maintain relationships, then it causes impairment. But -- so the goal of having a sort of special interest or a special hobby for these individuals, as well as for of us, is be able to balance it out so it's not causing problems in other areas of your life.

Q.   I guess my question though is does the intensity of the interest change or --

A.   Yes. Yes. It's usually, you know, it's not like one interest always for, you know, an entire lifetime. A lot of times it does stay the same but a lot of times it shifts for individuals. It varies.

MJ:  Questions in light of mine, Mr. Studenka?

CC:  No, sir.

MJ:  Major Marshall?

TC:  No, sir.

313

MJ: Dr. Schuck, we appreciate your testimony here today. I'm going to excuse you, which means that Major Marshall is going to disconnect you from the line. Again, thank you.

WIT: Okay. Thank you.

[The telephonic connection was terminated.]

MJ: Defense.

CC: Yes, sir.

At this time, the defense calls Mary Beth Fry to the stand.

**Ms. Mary Beth Fry, a civilian, was called as a witness by the defense, was sworn, and testified as follows:**

**DIRECT EXAMINATION**

**Questions by the prosecution:**

Q. Could you please state your full name spelling your last.
A. Mary Beth Fry, F-R-Y.

Q. And of what city and state are you a resident?
A. Newport Beach, California.

CC: Sir, permission to enter the well.

MJ: Granted.

**Questions by the defense counsel:**

Q. Now, ma'am, I know you testified in the past at an Article 32 as well as the motion regarding jurisdiction. Obviously this focus is a little different. I want to ask you first, you are Josh's grandmother, correct?
A. That's correct. I am his fraternal grandmother.

Q. Did you, in fact, adopt Josh?
A. Yes, I did.

Q. And how old was Josh when you adopted him?
A. He was 13 when I adopted him.

314

# Appendix B

I, Julie E. Schuck, Ph.D., declare as follows:

1. My name is Julie E. Schuck and I am a clinical psychologist licensed in the state of California. I am submitting this affidavit understanding that it may assist the court handling the case involving one of my patients, Joshua Fry.

2. By way of introduction, I received my Ph.D. in Clinical Psychology in 1993 and have been licensed in California as a psychologist in good standing since 1995. From 1995 through present, I have been in private practice (Julie Elliot Schuck, Ph.D., Inc. in Tustin, California) specializing in group social skills training, parent training and school consultation for children and adolescents on the autistic spectrum, as well as children and adolescents with Attention Deficit Hyper-Activity Disorder (ADHD), Oppositional Defiant Disorder (ODD), Conduct Disorder (CD), depression, anxiety and bi-polar disorder. In my practice, I typically see roughly 30 patients a week involving the conditions described above. In total, in my career as a licensed psychologist, I have seen over approximately 1000 patients. Between 1987 and 1998, I was also involved as a social skills coordinator and staff psychologist for the University of California Irvine Child Development Center, which provided a day treatment program for children with ADHD, ODD, CD and autism. I also worked with the UCI CDC's Irvine Paraprofessional Program, which is an intensive school-based intervention for children ADHD and ODD. This program was implemented in many Orange County schools, including Irvine, Santa Ana, Costa Mesa, and Huntington Beach.

3. I first met Josh as a patient in January of 1997. At the time, he was approximately 9 years old ▮▮▮▮▮▮▮. Josh had been referred to me given his earlier diagnosis of autism so that I could provide him group skills training in an effort to improve his social relationships and coping skills. I continued seeing Josh from January 1997 through November 27, 2007. During this period, I generally met with Josh on a bi-monthly basis. However, I did not see him while he attended school in Colorado in July of 2006 – October of 2007, although I did keep aware of his status during this period of time.

4. Through my extensive professional interaction with Josh, I have diagnosed (DSM-IV) him with Autism, ADHD, ODD, and Conduct Disorder. Although years of individual, group,

1633764.1

Newmeyer & Dillion LLP

and family therapy have improved Josh's ability to, in limited instances, be socially personable and generally interact with society, he maintains significant limitations in his ability to make non-superficial social connections. Also, as a result of his conditions, he is extremely impulsive, lacking judgment and reasoning skills necessary to make daily life decisions. Developmentally, he is mentally like a child at the age of 14. As a result of his conditions, he is preoccupied with meeting his immediate needs at the risk of his long-term benefits. His brain does not utilize critical thought and reasoning, as demonstrated by his impulsive behavior. Due to his autism and ADHD, Josh fails to weigh the consequences of his actions. His pursuit of gratifying his immediate needs fueled by his impulsivity have resulted in a long history of poor choices that evidence his lack of judgment and reasoning skills necessary to make life decisions.

5. Since I have known Josh, his special interests have focused on the military, guns, fire fighting and police work. These have become things that Josh perseverates on, or fixates on, often leading him to lie or steal to obtain paraphernalia (real looking fake guns, badges, holsters, etc.) for these special interests. Josh has even been found to be out in public impersonating a cop or military personnel. This is an example of his perseveration. What makes Josh's situation even more complicated is that his perceptual accuracy and reality testing are impaired, meaning he believes he can take on more challenging tasks than he is capable of. And historically, when he fails at these challenges, he will blame others for his failures to protect his reality that he is more capable than he really is.

6. Given the limitations that I have described, Josh is unable to independently handle his daily personal affairs, make important decisions, or manage his own money without significant structure and supervision. His plans and priorities focus on his immediate and often unrealistic desires, not on what is in his best interest in the long run.

7. I have been asked whether in my professional opinion, and based upon my over ten years of clinical evaluation of Josh, do I believe that Josh had the mental capacity to understand the significance of his enlistment in the military. My answer is no. Josh's decision to enlist in the Marines was no doubt driven by his long-term perseveration with being in the military, the fantasy that it was, and the impulsive decision to do something without remotely

1633764.1

- 2 -

considering the long-term consequences and his limitations. The opportunity to fulfill a life long dream and prove everyone wrong was likely his focus. Josh pursued this plan based solely on desire and gratification, without critical analysis and reasoning. The resulting problems unfortunately add to the long history of poor choices that provide additional evidence that he lacks the judgment and reasoning skills to make significant life decisions independently.

Executed on April _3_, 2009 in Newport Beach, California.

Julie E. Schuck, Ph.D.

NEWMEYER & DILLION LLP

1633764.1

- 3 -

DECLARATION OF JULIE SCHUCK

000200